## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

————————————————————x

UNITED STATES OF AMERICA; and
the STATE OF CALIFORNIA,
the STATE OF COLORADO,
the STATE OF CONNECTICUT,
the STATE OF DELAWARE,
the DISTRICT OF COLUMBIA,
the STATE OF FLORIDA,
the STATE OF GEORGIA,
the STATE OF HAWAII,
the STATE OF ILLINOIS,
the STATE OF INDIANA,
the STATE OF IOWA,
the STATE OF LOUISIANA,
the STATE OF MARYLAND,
the COMMONWEALTH OF
    MASSACHUSETTS,
the STATE OF MICHIGAN,
the STATE OF MINNESOTA,
the STATE OF MONTANA,
the STATE OF NEVADA,
the STATE OF NEW JERSEY,
the STATE OF NEW MEXICO,
the STATE OF NEW YORK,
the STATE OF NORTH CAROLINA,
the STATE OF OKLAHOMA,
the STATE OF RHODE ISLAND,
the STATE OF TENNESSEE,
the STATE OF TEXAS,
the COMMONWEALTH OF VIRGINIA,
the STATE OF WASHINGTON, and
the STATE OF WISCONSIN,

*ex rel.* [UNDER SEAL],

                    Plaintiffs,

        vs.

[UNDER SEAL],

                    Defendants.

————————————————————x

Case No. 13-CV-1177

JURY TRIAL DEMANDED

**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729, *ET SEQ.* AND STATE LAW COUNTERPARTS**

**UNDER SEAL**
**Pursuant to 31 U.S.C. § 3730(b)(2) and the Court's Order dated February 21, 2013**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————————————x

| | |
|---|---|
| UNITED STATES OF AMERICA; and<br>the STATE OF CALIFORNIA,<br>the STATE OF COLORADO,<br>the STATE OF CONNECTICUT,<br>the STATE OF DELAWARE,<br>the DISTRICT OF COLUMBIA,<br>the STATE OF FLORIDA,<br>the STATE OF GEORGIA,<br>the STATE OF HAWAII,<br>the STATE OF ILLINOIS,<br>the STATE OF INDIANA,<br>the STATE OF IOWA,<br>the STATE OF LOUISIANA,<br>the STATE OF MARYLAND,<br>the COMMONWEALTH OF<br>    MASSACHUSETTS,<br>the STATE OF MICHIGAN,<br>the STATE OF MINNESOTA,<br>the STATE OF MONTANA,<br>the STATE OF NEVADA,<br>the STATE OF NEW JERSEY,<br>the STATE OF NEW MEXICO,<br>the STATE OF NEW YORK,<br>the STATE OF NORTH CAROLINA,<br>the STATE OF OKLAHOMA,<br>the STATE OF RHODE ISLAND,<br>the STATE OF TENNESSEE,<br>the STATE OF TEXAS,<br>the COMMONWEALTH OF VIRGINIA,<br>the STATE OF WASHINGTON, and<br>the STATE OF WISCONSIN,<br><br>*ex rel.* JOHN MILLER,<br><br>                         Plaintiffs,<br><br>        vs.<br><br>CARECORE NATIONAL, LLC;<br>AETNA HEALTH, INC.;<br>AFFINITY HEALTH PLAN, INC.;<br>AMERICHOICE OF ARIZONA, INC.;<br>AMERICHOICE OF MARYLAND, INC.;<br>AMERICHOICE OF NEBRASKA, INC.;<br>AMERICHOICE OF NEW YORK, INC.; | Case No. 13-CV-1177<br><br>JURY TRIAL DEMANDED<br><br><br><br><br><br>**AMENDED**<br>**COMPLAINT**<br>**FOR VIOLATIONS OF THE**<br>**FEDERAL FALSE CLAIMS ACT, 31**<br>**U.S.C. § 3729, *ET SEQ.* AND STATE**<br>**LAW COUNTERPARTS**<br><br><br><br><br><br><br><br>**UNDER SEAL**<br>**Pursuant to 31 U.S.C. § 3730(b)(2) and**<br>**the Court's Order dated February 21,**<br>**2013** |

AMERICHOICE OF RHODE ISLAND, INC.;
AMERICHOICE OF TENNESSEE, INC.;
AVMED, INC.;
BLUE CROSS BLUE SHIELD OF ALABAMA;
COVENTRY HEALTHCARE, INC. d/b/a
    OMNICARE HEALTH PLAN, INC. and also
    d/b/a COVENTRYCARES OF MICHIGAN,
    INC.;
EMBLEMHEALTH SERVICES COMPANY
    LLC;
EXCELLUS HEALTH PLAN, INC. d/b/a
    EXCELLUS BLUE CROSS BLUE SHIELD;
GROUP HEALTH INC.;
HEALTHFIRST PHSP, INC.;
HEALTH NET, INC.;
HEALTHPLUS OF MICHIGAN, INC.;
HEALTH INSURANCE PLAN OF GREATER
    NEW YORK;
HORIZON BLUE CROSS BLUE SHIELD OF
    NEW JERSEY;
OXFORD HEALTH PLANS LLC;
ROCKY MOUNTAIN HEALTH PLANS, INC.;
UNITED HEALTHCARE SERVICES, INC.;
UNIVERA HEALTHCARE, INC.;
UNIVERSAL AMERICAN CORP.; and
WELLCARE HEALTHPLANS, INC.,

                    Defendants.

————————————————————————x

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ....................................................................................................1

II.  JURISDICTION AND VENUE ..............................................................................5

III. PARTIES .................................................................................................................6

    A.   Plaintiffs ........................................................................................................6

    B.   Defendant CareCore .....................................................................................7

    C.   The Defendant Insurers ................................................................................9

IV.  LEGAL AND REGULATORY FRAMEWORK ...................................................27

    A.   The False Claims Act ..................................................................................27

    B.   Medicare .....................................................................................................30

        1.   Medicare Coverage of Outpatient Diagnostic Testing and
            Procedures .......................................................................................31

        2.   Medicare's Requirements of Carrier Contractors ...........................34

    C.   Medicaid .....................................................................................................36

    D.   TRICARE/CHAMPUS ...............................................................................44

    E.   Federal Employee Health Benefits Program ..............................................45

V.   CARECORE'S AND THE DEFENDANT INSURERS' FRAUDULENT
    CONDUCT .............................................................................................................46

    A.   Background on CareCore's Operations and Participation in Government
        Healthcare Programs ...................................................................................46

    B.   CareCore's Padding Scheme – In Detail ...................................................50

        1.   Pre-Authorization Request Intake ...................................................50

        2.   Proper Pre-Authorization Approvals and Denials ...........................52

        3.   Improper Auto-Approved (*i.e.*, Padded) Pre-Authorization
            Requests ...........................................................................................56

        4.   The Padding PowerPoint Presentation .............................................63

5.      CareCore Incentivized Clinical Reviewers To Pad Cases .........................70

C.      The Defendant Insurers Were Reckless In Their Audit Function..........................72

D.      CareCore's Fraudulent Padding Scheme and the Defendant Insurers' Reckless Conduct Caused the Submission of False Claims and Loss to the Federal and State Treasuries ..................................................................74

COUNT I VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(A)...............................................................................................76

COUNT II (VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B))...............................................................................................78

COUNT III VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(A)...............................................................................................80

COUNT IV VIOLATION OF COLORADO MEDICAID FALSE CLAIMS ACT ....................81

COUNT V VIOLATION OF FLORIDA FALSE CLAIMS ACT ................................................83

COUNT VI VIOLATION OF GEORGIA MEDICAID FALSE CLAIMS ACT .........................84

COUNT VII VIOLATION OF ILLINOIS FALSE CLAIMS ACT .............................................86

COUNT VIII VIOLATION OF THE MARYLAND FALSE HEALTH CLAIMS ACT OF 2010 .................................................................................................................88

COUNT IX VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT.............89

COUNT X VIOLATION OF NEW JERSEY FALSE CLAIMS ACT .........................................92

COUNT XI VIOLATION OF NEW YORK FALSE CLAIMS ACT...........................................94

COUNT XII VIOLATION OF TENNESSEE MEDICAID FALSE CLAIMS ACT ..................96

COUNT XIII VIOLATION OF CALIFORNIA FALSE CLAIMS ACT ....................................98

COUNT XIV VIOLATION OF CONNECTICUT FALSE CLAIMS ACT ..............................100

COUNT XV VIOLATION OF DELAWARE FALSE CLAIMS AND REPORTING ACT.....................................................................................................................102

COUNT XVI VIOLATION OF DISTRICT OF COLUMBIA  MEDICAID FRAUD ENFORCEMENT AND RECOVERY AMENDMENT ACT OF 2012........................104

COUNT XVII VIOLATION OF HAWAII FALSE CLAIMS ACT..........................................106

COUNT XVIII VIOLATION OF INDIANA FALSE CLAIMS AND
WHISTLEBLOWER PROTECTION ACT .................................................................108

COUNT XIX VIOLATION OF IOWA FALSE CLAIMS ACT ................................................110

COUNT XX VIOLATION OF LOUISIANA MEDICAL ASSISTANCE PROGRAMS
INTEGRITY LAW ........................................................................................................112

COUNT XXI VIOLATION OF MASSACHUSETTS FALSE CLAIMS ACT ........................114

COUNT XXII VIOLATION OF MINNESOTA FALSE CLAIMS ACT .................................116

COUNT XXIII VIOLATION OF MONTANA FALSE CLAIMS ACT ...................................118

COUNT XXIV VIOLATION OF NEVADA FALSE CLAIMS ACT ......................................120

COUNT XXV VIOLATION OF NEW MEXICO MEDICAID FALSE CLAIMS ACT..........122

COUNT XXVI VIOLATION OF NORTH CAROLINA FALSE CLAIMS ACT....................124

COUNT XXVII VIOLATION OF OKLAHOMA MEDICAID FALSE CLAIMS ACT...........126

COUNT XXVIII VIOLATION OF RHODE ISLAND FALSE CLAIMS ACT ........................128

COUNT XXIX VIOLATION OF TEXAS MEDICAID FRAUD PREVENTION ACT ...........130

COUNT XXX VIOLATION OF VIRGINIA FRAUD AGAINST TAXPAYERS ACT ...........132

COUNT XXXI VIOLATION OF WASHINGTON MEDICAID FRAUD FALSE
CLAIMS ACT ...............................................................................................................134

COUNT XXXII VIOLATION OF WISCONSIN MEDICAID FALSE CLAIMS ACT...........136

JURY TRIAL DEMAND ........................................................................................................151

Plaintiff and *qui tam* Relator, John Miller ("Relator"), on behalf of the United States of America (the "United States") and the States of California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and Wisconsin (collectively, the "*Qui Tam* States"), brings this action pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended (the "Federal False Claims Act"), and the *Qui Tam* States' statutes as enumerated below, against Defendant CareCore National, LLC ("CareCore"), and Defendants Aetna Health, Inc., Affinity Health Plan, Inc., Americhoice of Arizona, Inc., Americhoice of Maryland, Inc., Americhoice of Nebraska, Inc., Americhoice of New York, Inc., Americhoice of Rhode Island, Inc., Americhoice of Tennessee, Inc., Avmed, Inc., Blue Cross Blue Shield of Alabama, Coventry Healthcare, Inc. d/b/a OmniCare Health Plan, and also d/b/a CoventryCares of Michigan, Inc., EmblemHealth Services Company LLC, Excellus Health Plan, Inc. d/b/a Excellus Blue Cross Blue Shield, Group Health Inc., HealthFirst PHSP, Inc., Health Net, Inc., HealthPlus of Michigan, Inc., Health Insurance Plan of Greater New York, Horizon Blue Cross Blue Shield of New Jersey, Oxford Health Plans LLC, Rocky Mountain Health Plans, Inc., United Healthcare Services, Inc., Univera Healthcare, Inc., Universal American Corp., and Wellcare HealthPlans, Inc. (collectively, the "Defendant Insurers," and with CareCore, the "Defendants").  In support thereof, Relator alleges as follows:

## I.   <u>INTRODUCTION</u>

1.      This is an action to recover damages and civil penalties on behalf of the United States and the *Qui Tam* States arising from false and/or fraudulent records, statements and claims

made, used or presented and/or caused to be made, used or presented by Defendants and/or their agents or employees under the Federal False Claims Act and the *Qui Tam* States' statutes.

2.      Medicare and other government programs, as well as private insurance carriers, only cover and reimburse medical services, including outpatient diagnostic services, which are medically "reasonable and necessary."    42 U.S.C. § 1395y(a)(1)(A);    42 U.S.C. § 1395x(s)(2)(C), (s)(3), (s)(14) and (s)(15).

3.      Medical reasonableness and necessity determinations are often made in the pre-authorization/pre-certification context.

4.      Defendant CareCore provides outpatient diagnostic testing and procedure utilization management services, including pre-authorization/pre-certification determinations, under contracts with private insurance companies, *i.e.*, carrier contractors, that have themselves contracted directly or indirectly with government healthcare programs, primarily Medicare and Medicaid, to provide insurance benefits to government healthcare beneficiaries.

5.      In administering government-funded healthcare insurance programs, carrier contractors are required to perform certain functions, including those related to pre-authorization and payment processing for outpatient diagnostic services.   A carrier contractor may also subcontract with third parties, like CareCore, to perform these functions for the carrier contractor under the government contracts.

6.      As relevant here, CareCore's contracts with carrier contractors, including those with the Defendant Insurers, included a key timing provision that required CareCore to approve or deny each request for pre-authorization to deem diagnostic services to a given beneficiary as medically reasonable and necessary (*i.e.*, each "case") in a timely fashion – within two days of the request; or within three hours of the request if the case was designated as "urgent."

7.     If CareCore failed to comply with the time constraints, CareCore would be fined $3,000 per pre-authorization request, pursuant to the contracts.

8.     Since at least February 2007, Defendant CareCore has engaged in fraudulent activities involving its role as the gatekeeper for determining the reasonableness and necessity of diagnostic services.  As detailed herein, in an effort to keep up with the sheer volume of pre-authorization requests for diagnostic services and to avoid the exorbitant $3,000 penalty per case, CareCore instituted a scheme simply to auto-approve hundreds of cases on a daily basis, and on most days over one thousand cases, deeming those diagnostic services as reasonable and necessary, even though there had been no evaluation of those cases by the appropriate medical personnel.

9.     CareCore specifically directed its nursing personnel, internally called "Clinical Reviewers," including Relator and other supervisors, to auto-approve pre-authorization requests or to "Process As Directed" or to "PAD" cases that already had been designated for higher level review by one of CareCore's on-staff physicians, internally called "Medical Directors," *before* such cases actually were reviewed by a Medical Director for determination as to the medical reasonableness and necessity of the diagnostic service, in contravention of the law as well as CareCore's own stated policies and procedures (the "Padding Scheme").

10.    Since at least February 2007, based upon Relator's experience, CareCore has "Padded" on average a minimum of 1,000 cases every day, and many days up to 2,000 cases.

11.    Absent the Padding Scheme, 60% to 70% of those Padded cases per day would have been denied pre-authorization.

12.    Virtually all of the insurers with which CareCore contracted covered government beneficiaries.  Some, like the United Healthcare-Medicare Plan ("UHC-Medicare"), covered

exclusively government beneficiaries. Conservatively estimating that 30% to 40% of cases submitted to CareCore for pre-authorization pertained to Medicare or Medicaid patients, approximately 180 to 280 of the diagnostic services (some costing upwards of $3,000) that were fraudulently pre-authorized on a daily basis were paid for/reimbursed by government programs (not including the government programs in addition to Medicare and Medicaid).

13.     As a result of CareCore's fraudulent conduct, the government programs have been paying and continue to pay as much as $840,000 daily for diagnostic services which were and are not medically reasonable and necessary.

14.     The Defendant Insurers knew or were reckless in not knowing (*i.e.*, had they conducted proper audits of CareCore's pre-authorization requests that were approved, they would have discovered) that CareCore in fact had not been properly reviewing the cases, and that its Clinical Reviewer nurses were simply auto-approving pre-authorization requests that required a higher level of review by a Medical Director.

15.     Defendant Insurers turned a blind eye to CareCore's practices because it would have been more expensive and time-consuming for Defendant Insurers properly to perform the auditing function as to CareCore and because it certainly would have been more costly to directly administer determinations as to medical reasonableness and necessity for diagnostic services. That is, the Defendant Insurers wanted to delegate this pre-authorization function concerning the determination of medical reasonableness and necessity of outpatient diagnostic services and simply ignored whether CareCore performed this delegated function properly or not.

16.     Defendants knew, or were reckless in not knowing, that their conduct, as described herein, would lead to the submission and payment of claims for reimbursement by

government healthcare programs for diagnostic services that were not medically reasonable or necessary and thus, were not eligible for reimbursement.

17.     But for Defendants' illegal conduct, those diagnostic services would not have been pre-approved nor reimbursed.

18.     As a result, Defendants have caused, and continue to cause, the submission of millions, if not billions, of dollars of false claims to government programs, and Defendants have benefited from the payment of those false claims.

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732(a).  The Court has original jurisdiction over the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transactions or occurrences brought on behalf of the United States under 31 U.S.C. § 3730.

20.     This Court has personal jurisdiction over the Defendants because, among other things, the Defendants transact business in this judicial district, and engaged in wrongdoing in this judicial district.

21.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).  The Defendants transact business within this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

22.     Pursuant to 31 U.S.C. § 3730(b)(2), along with this Amended Complaint, Relator prepared and has served on the Attorney General of the United States, the United States Attorney for the Southern District of New York, and the Attorneys General of the *Qui Tam* States written disclosures of all material evidence and information currently in his possession.

23.     This action is not based upon prior public disclosure of allegations or transactions in a federal criminal, civil, or administrative hearing, in which the government or its agent is a party.   Nor have Relator's allegations or transactions herein been publicly disclosed in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or in news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A) and parallel provisions of the *Qui Tam* States' statutes.

24.     To the extent there has been a public disclosure unknown to Relator of any of the allegations herein, Relator is the original source of those allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B) and parallel provisions of the *Qui Tam* States' statutes.

## III.   PARTIES

### A.     Plaintiffs

25.     Relator John Miller ("Relator") is a citizen of the United States and a resident of the State of Colorado.

26.     Relator is a trained Licensed Practical Nurse ("L.P.N."), having received his degree from Pike's Peak Community College in 2001 and his L.P.N. Certification in 2002.

27.     Relator was a nurse at Pike's Peak Hospice from 2002 until January 2005, when he joined CareCore in Colorado Springs as a Clinical Reviewer.

28.     In or about the Spring/Summer 2007, Relator was promoted to Clinical Supervisor and served in this capacity until late September 2012, when he was terminated by CareCore.

29.     In his role as a Clinical Supervisor, Relator supervised approximately 22 nurses/Clinical Reviewers.   Relator was thus in a unique position to witness Defendants' fraudulent schemes in action.

30.     Relator's personal knowledge of Defendants' illegal conduct is supported by his own personal investigation undertaken to further develop and substantiate the allegations set forth in this Amended Complaint.

31.     Plaintiff, the United States of America, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare"), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* ("Medicaid"), and acting through the Department of Defense and its Defense Health Agency (formerly, the TRICARE Management Activity, "TMA"), oversees the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") and TRICARE, 10 U.S.C. § 1071 and 32 C.F.R. §§ 199.4, 199.17(a); and acting through the Office of Personnel Management ("OPM") administers the Federal Employee Health Benefits Program ("FEHBP").

32.     The Plaintiff-States of California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and Wisconsin (hereinafter the "*Qui Tam* States"), participate in the Medicaid program and have State False Claims Acts which permit private persons, such as Relator, to sue on their behalf to recover for false and fraudulent claims submitted for payment by Medicaid programs and/or other government healthcare programs.

### B.     Defendant CareCore

33.     Defendant CareCore is a New York limited liability company with its principal place of business located at 400 Buckwalter Place Boulevard, Bluffton, South Carolina 29910.

34.     Prior to moving to Bluffton in 2009, CareCore's principal place of business was in Wappinger Falls, New York (Dutchess County).

35.     CareCore contracts with private healthcare insurance companies to provide pre-authorization services pertaining to outpatient diagnostic tests and procedures ordered by treating physicians for the insurers' patient-beneficiaries.

36.     Many of CareCore's private insurer clients are also carrier contractors under Medicare and state Medicaid programs, as well as for other government healthcare programs. Thus, CareCore pre-authorizes diagnostic services that are ordered for Medicare, Medicaid and other government program patient-beneficiaries, many of which, as alleged herein, did not qualify as "covered services," but yet were ultimately paid for by those programs.

37.     CareCore employs a total of approximately 1,400 employees, of whom approximately 200 to 250 are nurses employed as Clinical Reviewers or Clinical Supervisors, and approximately 50 are physicians employed as Medical Directors.

38.     Because CareCore's pre-authorization services can be performed remotely – *i.e.*, diagnostic services can be approved or denied via telephone, fax, or the internet – many of CareCore's employees are located throughout the country in Colorado, South Carolina, New York, California, Texas and Florida.

39.     Approximately 95% of CareCore's nurses work off site, *i.e.*, from home.

40.     All of CareCore's doctors work off site, except for the Chief Medical Officer, Shelley Weiner, M.D., and the Co-President and Chairman of the Management Committee, Richard Weininger, M.D.

41.     CareCore's specialty benefits management business currently covers approximately 50 million health plan covered lives, including Medicare, Medicaid and other

government program beneficiaries and has earned the company hundreds of millions of dollars, with 2011 revenues estimated at $560 million.

42.     CareCore touts its services as "Evidence-based Specialty Benefits Management"; however, as detailed herein, there is no evidentiary basis for pre-approval of the cases that CareCore has "Padded."

C.      **The Defendant Insurers**

43.     The Defendant Insurers contracted, directly or indirectly, with one or more federal and/or state government programs to provide, *inter alia*, pre-authorization services for outpatient diagnostic tests and procedures ordered for government program beneficiaries.

44.     The Defendant Insurers contracted, directly or indirectly, with CareCore.

45.     The Defendant Insurers delegated to CareCore the duty to make pre-authorization decisions on outpatient diagnostic services, certain of which the Defendant Insurers and CareCore knew would result in payment/reimbursement by government programs for those diagnostic services that were pre-authorized for government program beneficiaries.

46.     Relator has collected representative examples of cases that were Padded by CareCore, as well as some properly reviewed and processed cases for comparison.  Attached as Exhibit A to this Amended Complaint is a chart of all of the cases for which Relator collected screen shots from CareCore's PreAuthorization Database, sorted by Defendant Insurers and sorted by Plan Type within the cases for Defendant Insurers.  The screen shots themselves pertaining to each case, Exhibits A-1 through A-122, are attached to the Revised Original Disclosure being served with this Amended Complaint.

47.     Exhibit A contains the following details from CareCore's Pre-Authorization Database:

       a.      Plaintiff/Relator's assigned Patient Number (Nos. 1 through 122);

- 9 -

b.      Radiology Management Case Number reference (assigned by CareCore);

c.      Episode Date (*i.e.,* date testing was ordered);

d.      Approved/Denied Date;

e.      Insurer/Payor and Plan Type (Medicare, Medicaid, other);

f.      State wherein testing was to be performed/where the beneficiary resided;

g.      Case Status ("A" for Approved or "D" for Denied);

h.      Padded (Y/N) (an indication as to whether or not the case was Padded);

i.      Time Padded;

j.      Padding Level (Levels 1 through 6) (as per Relator);

k.      Clinical Reviewer nurse's name who Padded the case (or, for properly handled cases, the name of the Medical Director doctor);

l.      CPT Code for the diagnostic test or procedure to be performed;

m.      Name of the test or procedure; and,

n.      Journal Entry entered by the Clinical Reviewer and/or Medical Director.

48.     Each of the Defendant Insurers is either a Non-Risk Plan or a Risk Plan.  In terms of the Padding Scheme, CareCore treated cases involving beneficiaries whose claims were administered by Non-Risk Plans differently than those administered by Risk Plans, as explained in detail *infra*.  Regardless, cases for beneficiaries whose claims were administered by both types of plans were Padded.

49.     As alleged herein, the Defendant Insurers failed to conduct proper audits of CareCore's services.

50.     Proper audits of CareCore's services by the Defendant Insurers would have revealed the Padding Scheme.

- 10 -

51.     As to Aetna Health, Inc. ("Aetna"):

    a.     Aetna is a Pennsylvania corporation with its principal place of business located at 151 Farmington Avenue, Hartford, CT 06156.

    b.     Aetna, directly or through its affiliates, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims and/or claims in at least the states of New York and New Jersey.

    c.     Upon information and belief, Aetna, directly, or through its affiliates, has contracted with one or more of the *Qui Tam* States and/or their subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans.

    d.     Aetna, directly or through its affiliates, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare beneficiaries, as well as for private health insurance beneficiaries, and, upon information and belief, for Medicaid beneficiaries and/or other government-funded plan beneficiaries.

52.     As to Affinity Health Plan, Inc. ("Affinity"):

    a.     Affinity is a New York corporation with its principal place of business located at 2500 Halsey Street, Bronx, New York 10461.

    b.     Affinity, directly or through its affiliates, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims in at least the state of New York.

    c.     Affinity, directly or through its affiliates, also has contracted with the State of New York or its subcontractors in connection with administering

Medicaid claims and claims under New York's Child Health Plus ("CHP") and Family Health Plus ("FHP").

d.     Upon information and belief, Affinity, directly, or through its affiliates, also has contracted with one or more of the other *Qui Tam* States in addition to New York, and/or those States' subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans.

e.     Affinity, directly, or through its affiliates, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare, Medicaid, CHP and FHP beneficiaries and/or other government-funded plan beneficiaries.

53.     As to Americhoice of Arizona, Inc., Americhoice of Maryland, Inc., Americhoice of Nebraska, Inc., Americhoice of New York, Inc., Americhoice of Rhode Island, Inc., and Americhoice of Tennessee, Inc.:

a.     Americhoice of Arizona, Inc., Americhoice of Maryland, Inc., Americhoice of Nebraska, Inc., Americhoice of New York, Inc., Americhoice of Rhode Island, Inc., and Americhoice of Tennessee, Inc. are all affiliates of United Healthcare Services, Inc. ("UHC"):

b.     UHC is a Minnesota corporation with its principal place of business located at 9900 Bren Road East, Minnetonka, MN 55343.

c.     Through its New York affiliate, UHC also maintains a place of business at 77 Water Street, 14th Floor, New York, NY 10005.

d.     Upon information and belief, UHC, directly or through its Arizona affiliate, Americhoice of Arizona, Inc., has contracted with the State of Arizona or its subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans in Arizona.

e.     UHC, directly or through its Maryland affiliate, Americhoice of Maryland, Inc., has contracted with the State of Maryland or its subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans in Maryland.

f.     Upon information and belief, UHC, directly or through its Nebraska affiliate, Americhoice of Nebraska, Inc., has contracted with the State of Nebraska or its subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans in Nebraska.

g.     UHC, directly or through its New York affiliate, Americhoice of New York, Inc., has contracted with the State of New York or its subcontractors in connection with administering Medicaid claims and claims under CHP and FHP and/or other state-funded plans in New York.

h.     Upon information and belief, UHC, directly or through its Rhode Island affiliate, Americhoice of Rhode Island, Inc., has contracted with the State of Rhode Island or its subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans in Rhode Island.

i.     UHC, directly or through its Tennessee affiliate, Americhoice of Tennessee, Inc., has contracted with the State of Tennessee or its

- 13 -

subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans in Tennessee.

j.  UHC, directly or through its affiliates, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicaid, CHP and FHP beneficiaries and/or other government-funded plan beneficiaries in Maryland, New York, and Tennessee, and upon information and belief also in Arizona, Nebraska, and Rhode Island.

54.  As to AvMed, Inc. ("AvMed"):

a.  AvMed is a Florida corporation with its principal place of business located at 9400 South Dadeland Boulevard, Miami, Florida.

b.  Upon information and belief, AvMed, directly or through its affiliates, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims and/or claims under other government-funded plans.

c.  Upon information and belief, AvMed, directly or through its affiliates, has contracted with the *Qui Tam* States, or those States' subcontractors, in connection with administering Medicaid claims and/or claims under other state-funded plans.

d.  Upon information and belief, AvMed, directly or through its affiliates, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare, Medicaid, and/or other government-funded health plan beneficiaries.

55.  As to Blue Cross Blue Shield of Alabama ("BCBS Alabama"):

a.  BCBS Alabama is an Alabama corporation with its principal place of business located at 450 Riverchase Parkway, East Birmingham, AL 35244.

b.  BCBS Alabama, directly or through its affiliates, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims in at least the state of Alabama.

c.  BCBS Alabama, directly or through its affiliates, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare beneficiaries, as well as for private health insurance beneficiaries.

56.  As to Coventry Healthcare, Inc. ("Coventry"):

a.  Coventry is a Delaware corporation with its principal place of business located at 6705 Rockledge Drive, Suite 900, Bethesda, MD 20817.

b.  In the state of Michigan, Coventry did business as OmniCare Health Plan, Inc. up until June 1, 2012, when OmniCare changed its name to CoventryCares of Michigan, Inc.

c.  In August 2012, Aetna announced that it would acquire Coventry for approximately $5.7 billion in cash and stock, a move Aetna said would help it expand further into government-backed programs like Medicaid and Medicare.

d.  Coventry, and/or its successors or affiliates, has contracted with the State of Michigan or its subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans.

e.     Upon information and belief, Coventry, and/or its successors or affiliates, has contracted with other *Qui Tam* States, in addition to Michigan, or those States' subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans.

f.     Coventry, and/or its successors or affiliates, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services, upon information and belief, for Medicaid beneficiaries and/or other government-funded health plan beneficiaries.

57.   As to EmblemHealth Services Company LLC ("EmblemHealth"):

a.     EmblemHealth is a New York Corporation with its principal place of business located at 55 Water Street, New York, New York 10041.

b.     Group Health Inc. ("GHI") is a licensed affiliate of EmblemHealth.

c.     Health Insurance Plan of Greater New York ("HIP") is a licensed affiliate of EmblemHealth.

d.     Upon information and belief, EmblemHealth, directly or through its affiliates, including but not limited to GHI and HIP, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims.

e.     Upon information and belief, EmblemHealth, directly or through its affiliates, including but not limited to GHI and HIP, has contracted with the *Qui Tam* States, or those States' subcontractors, in connection with administering Medicaid claims and/or claims under other state-funded plans.

      f.     Upon information and belief, EmblemHealth, directly or through its affiliates, including but not limited to GHI and HIP, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare, Medicaid, and/or other government-funded health plan beneficiaries.

58.    As to Excellus Health Plan, Inc., d/b/a Excellus Blue Cross Blue Shield ("Excellus"):

      a.     Excellus is a New York corporation with its principal place of business located at 165 Court Street, Rochester, New York 14647.

      b.     Excellus is a wholly-owned subsidiary of Lifetime Healthcare, Inc.

      c.     Upon information and belief, Excellus, directly or through its affiliates, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims.

      d.     Upon information and belief, Excellus, directly or through its affiliates, has contracted with the *Qui Tam* States, or those States' subcontractors, in connection with administering Medicaid claims and/or claims under other state-funded plans.

      e.     Upon information and belief, Excellus, directly or through its affiliates, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare, Medicaid, and/or other government-funded health plan beneficiaries.

59.    As to Group Health Inc. ("GHI"):

    a.     GHI is a New York corporation with its principal place of business located at 441 Ninth Avenue, New York, NY 10001.

    b.     GHI is an affiliate under the control of EmblemHealth.

    c.     GHI, directly or through its affiliates or through EmblemHealth, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims in at least the state of New York.

    d.     Upon information and belief, GHI, directly or through its affiliates or through EmblemHealth, has contracted with the *Qui Tam* States, or those States' subcontractors, in connection with administering Medicaid claims and/or claims under other state-funded plans.

    e.     GHI, directly or through its affiliates or through EmblemHealth, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare beneficiaries, as well as private health insurance beneficiaries, and upon information and belief, Medicaid, and/or other government-funded health plan beneficiaries.

60.    As to HealthFirst PHSP, Inc. ("HealthFirst"):

    a.     HealthFirst is a New York corporation with its principal place of business located at 100 Church Street, New York, NY 10007.

    b.     HealthFirst, directly or through its affiliates, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims in at least the state of New York.

    c.     HealthFirst, directly or through its affiliates, has contracted with the State of New York or its subcontractors in connection with administering

Medicaid claims, claims under CHP and FHP in New York and/or claims under other state-funded plans in New York.

d.   HealthFirst, directly or through its affiliates, has contracted with the State of New Jersey or its subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans in New Jersey.

e.   HealthFirst, directly or through its affiliates, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare, Medicaid, CHP and FHP and/or other government-funded plan beneficiaries.

61.   As to Health Net, Inc. ("Health Net"):

a.   Health Net is a Delaware corporation with principal place of business located at 21650 Oxnard Street, Woodland Hills, California 91367.

b.   The headquarter of its affiliate, Health Net of the Northeast, Inc., is located at One Far Mill Crossing, Shelton, Connecticut 06484.

c.   In 2009, Health Net and/or certain of its affiliates were acquired by UHC.

d.   Upon information and belief, Health Net, directly or through its affiliates or through UHC, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims.

e.   Upon information and belief, Health Net, directly or through its affiliates or through UHC, has contracted with the *Qui Tam* States, or those States' subcontractors, in connection with administering Medicaid claims and/or claims under other state-funded plans.

- 19 -

     f.     Upon information and belief, Health Net, directly or through its affiliates or through UHC, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare, Medicaid, and/or other government-funded health plan beneficiaries.

62.    As to HealthPlus of Michigan, Inc. ("HealthPlus–MI"):

     a.     HealthPlus–MI is a Michigan corporation with its principal place of business located at 2050 S. Linden Road, Flint, MI 48532.

     b.     HealthPlus–MI, directly or through its affiliates, has contracted with subcontractors of CMS and/or CMS itself in connection with administering Medicare claims.

     c.     HealthPlus–MI, directly or through its affiliates, has contracted with the State of Michigan or its subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans in the state of Michigan.

     d.     HealthPlus–MI, directly or through its affiliates, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare, Medicaid, and/or other government-funded plan beneficiaries.

63.    As to Health Insurance Plan of Greater New York ("HIP"):

     a.     HIP is a New York corporation with its principal place of business located at 55 Water Street, New York, NY 10041.

     b.     HIP is an affiliate under the control of EmblemHealth.

    c.      HIP, directly or through its affiliates, or through EmblemHealth, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims in at least the state of New York.

    d.      HIP, directly or through its affiliates, or through EmblemHealth, has contracted with the State of New York or its subcontractors in connection with administering Medicaid claims, claims under CHP and FHP and/or claims under other state-funded plans in New York.

    e.      HIP, directly or through its affiliates, or through EmblemHealth, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare, Medicaid, CHP and FHP beneficiaries and/or other government-funded plan beneficiaries.

64.     As to Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBS"):

    a.      Horizon BCBS is a New Jersey corporation with its principal place of business located at 3 Penn Plaza East, Newark, NJ 07105.

    b.      Horizon BCBS, directly or through its affiliates, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims in at least the state of New Jersey.

    c.      Upon information and belief, Horizon BCBS directly or through its affiliates, has contracted with one or more of the *Qui Tam* States, or those States' subcontractors, in connection with administering Medicaid claims and/or claims under other state-funded plans.

    d.      Horizon BCBS, directly or through its affiliates, has contracted with CareCore in connection with requests for pre-authorization of diagnostic

services for Medicare beneficiaries, as well as private health insurance beneficiaries and, upon information and belief, Medicaid, and/or other government-funded health plan beneficiaries.

65.    As to Oxford Health Plans LLC ("Oxford"):

a.    Oxford was a Delaware corporation with its principal place of business located at 48 Monroe Turnpike, Trumbull, CT 06611.

b.    In July 2004, Oxford merged with UHC.

c.    Oxford, directly, or through its affiliates or through UHC, has contracted with subcontractors of CMS and/or CMS itself in connection with administering Medicare claims in various states, including at least the states of New York and New Jersey.

d.    Upon information and belief, Oxford, directly, or through its affiliates or through UHC, also has contracted with one or more of the *Qui Tam* States, and/or those States' subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans.

e.    Oxford, directly, or through its affiliates or through UHC, has contracted, directly or indirectly, with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare beneficiaries, as well as private health insurance beneficiaries, and upon information and belief, for Medicaid beneficiaries and/or other government-funded health plan beneficiaries.

66.    As to Rocky Mountain Health Plans, Inc. ("RMHP"):

a.    RMHP is a Colorado corporation with its principal place of business located at 2775 Crossroads Boulevard, Grand Junction, Colorado 81506.

b.    RMHP has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims in at least the state of Colorado.

c.    RMHP has contracted with the State of Colorado or its subcontractors, in connection with administering Medicaid claims and/or claims under other state-funded plans in Colorado.

d.    RMHP has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare and Medicaid beneficiaries and/or other government-funded plan beneficiaries.

67.    As to United Healthcare Services, Inc. ("UHC"):

a.    UHC is a Minnesota corporation with its principal place of business located at 9900 Bren Road East, Minnetonka, MN 55343, and is the health benefits operating division of its parent company, United HealthGroup Incorporated.

b.    UHC has contracted, directly or indirectly, with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims in various states, including, but not limited to New York, Alabama, Arizona, Colorado, Connecticut, Florida, Georgia, Illinois, Iowa, Massachusetts, Maryland, Missouri, North Carolina, Ohio, Rhode Island, Tennessee, Texas, Utah, Virginia, and Wisconsin, and upon information and belief,

also in Delaware, District of Columbia, Hawaii, Indiana, Louisiana, Michigan, New Mexico, and Washington.

c.  UHC has contracted, directly or indirectly, with the State of New York or its subcontractors in connection with administering Medicaid, CHP and/or FHP claims and/or claims under other state-funded plans in New York.

d.  Upon information and belief, UHC has contracted, directly or indirectly, with other *Qui Tam* States, in addition to the State of New York, or those States' subcontractors in connection with administering Medicaid claims and/or claims under other state-funded plans.

e.  UHC has contracted, directly or indirectly, with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare and Medicaid beneficiaries, and/or beneficiaries of other government-funded health plans.

68.  As to Univera Healthcare, Inc. ("Univera"):

a.  Univera is a New York corporation and/or an assumed name of Excellus Health Plan Inc., with its principal place of business located at 205 Park Club Lane, Buffalo, New York 14221.

b.  Upon information and belief, Univera, directly or through its affiliates, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims in at least the state of New York.

c.  Upon information and belief, Univera, directly or through its affiliates, has contracted with the *Qui Tam* States, or those States' subcontractors in

connection with administering Medicaid claims and/or claims under other state-funded plans.

d.    Upon information and belief, Univera, directly or through its affiliates, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare, Medicaid, and/or other government-funded health plan beneficiaries.

69.    As to Universal American Corp. ("Universal"):

a.    Universal is a Delaware corporation with its principal place of business located at 6 International Drive, Rye Brook, NY 10573-1068.

b.    Universal, directly or through its affiliates, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims in at least the state of New York.

c.    Upon information and belief, Universal, directly or through its affiliates, has contracted with the *Qui Tam* States or those States' subcontractors, in connection with administering Medicaid claims and/or claims under other state-funded plans.

d.    Universal has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare beneficiaries and, upon information and belief, for Medicaid and/or other government-funded health plan beneficiaries.

70.    As to WellCare HealthPlans, Inc. ("WellCare"):

a.    WellCare is a Delaware corporation with its principal place of business located at 8735 Henderson Road, Tampa, FL 33634.

b.      WellCare operates through its affiliates located throughout the country, including in Florida, Georgia, Illinois, and New York.

c.      WellCare, directly or through its affiliates, has contracted with subcontractors of CMS and/or CMS itself, in connection with administering Medicare claims in various states, including Connecticut, Florida, and New York.

d.      WellCare, directly or through its affiliates, has contracted with the State of Florida or its subcontractors, in connection with administering Medicaid claims in Florida.

e.      WellCare, directly or through its affiliates, has contracted with the State of Georgia or its subcontractors, in connection with administering Medicaid claims in Georgia.

f.      WellCare, directly or through its affiliates, has contracted with the State of Illinois or its subcontractors, in connection with administering Medicaid claims in Illinois.

g.      WellCare, directly or through its affiliates, has contracted with the State of New York or its subcontractors, in connection with administering Medicaid, CHP and/or FHP claims in New York.

h.      Upon information and belief, Wellcare, directly or through its affiliates, has contracted with other *Qui Tam* States, in addition to the States of Florida, Georgia, Illinois and New York, and/or those States' subcontractors, in connection with administering Medicaid claims and/or claims under other state-funded plans.

i.      Wellcare, directly or through its subsidiaries, has contracted with CareCore in connection with requests for pre-authorization of diagnostic services for Medicare and Medicaid, CHP and FHP beneficiaries and/or beneficiaries of other government-funded plans.

## IV.    LEGAL AND REGULATORY FRAMEWORK

### A.    The False Claims Act

71.    The False Claims Act, 31 U.S.C. § 3729, as amended, provides:

(a)    **Liability for certain acts** –

(1) In general – Subject to paragraph (2), any person who –

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

* * *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(l).

72.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

73.    "Knowingly" is defined by the False Claims Act as "mean[ing] that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate

ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information…."  31 U.S.C. § 3729(b)(1)(A).

74.     Given its remedial purposes, the False Claims Act is interpreted broadly, and is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government."  *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

75.     The False Claims Act empowers a private person having information regarding a false or fraudulent claim against the Government to bring an action on the Government's behalf and to share in any recovery.  31 U.S.C. § 3730.  The complaint must be filed under seal without service on the defendant.  *Id*.  The complaint remains under seal to give the Government an opportunity to conduct an investigation into the allegations and to determine whether to join the action.  *Id*.

76.     Each of the *Qui Tam* States has adopted a False Claims Act that provides comparable relief to those states for the submission of false and fraudulent claims.  These include:

   a.   California: CAL. GOV'T CODE § 12650, *et seq.*;

   b.   Colorado:  COLO. REV. STAT. ANN. § 25.5-4-303.5, *et seq.*;

   c.   Connecticut:  CONN. GEN. STAT. § 17b-301, *et seq.*;

   d.   Delaware:  DEL. CODE ANN. tit. 6, § 1201, *et seq.*;

   e.   District of Columbia:  D.C. CODE ANN. § 2-381.01, *et seq.*;

   f.   Florida:  FLA. STAT. ANN. § 68.081, *et seq.*;

   g.   Georgia:  GA. CODE ANN. § 49-4-168, *et seq.*;

   h.   Hawaii: HAW. REV. STAT. § 661-21, *et seq.*;

   i.   Illinois:  740 ILL. COMP. STAT. ANN. 175/1, *et seq.*;

   j.   Indiana:  IND. CODE § 5-11-5.5-1, *et seq.*;

k.  Iowa:  IOWA Code § 685.1, *et seq.*;

l.  Louisiana:  LA. REV. STAT. ANN. § 46:437.1, *et seq.*;

m.  Maryland:  MD. CODE ANN., Health-Gen. § 2-601, *et seq.*;

n.  Massachusetts:  MASS. GEN. LAWS ch. 12, § 5A, *et seq.*;

o.  Michigan:  MICH. COMP. LAWS ANN. § 400.601, *et seq.*;

p.  Minnesota: MINN. STAT. § 15C.01, *et seq.*;

q.  Montana:  MONT. CODE ANN. § 17-8-401, *et seq.*;

r.  Nevada:  NEV. REV. STAT. § 357.010, *et seq.*;

s.  New Jersey:  N.J. STAT. ANN. § 2A:32C-1, *et seq.*;

t.  New Mexico:  N.M. STAT. ANN. § 27-14-1, *et seq.*;

u.  New York:  N.Y. STATE FIN. LAW § 187, *et seq.*;

v.  North Carolina:  N.C. GEN. STAT. § 1-605, *et seq.*;

w.  Oklahoma: OKLA. STAT. ANN. tit. 63, § 5053, *et seq.*;

x.  Rhode Island:  R.I. GEN. LAWS § 9-1.1-1, *et seq.*;

y.  Tennessee:  TENN. CODE ANN. § 71-5-181, *et seq.*

z.  Texas:  TEX. HUM. RES. CODE ANN. § 36.001, *et seq.*;

aa.  Virginia:  VA. CODE ANN. § 8.01-216.1, *et seq.*;

bb.  Washington:  WASH. REV. CODE § 74.66.005, *et seq.*; and

cc.  Wisconsin:  WIS. STAT. § 20.931.

77.  Pursuant to the federal False Claims Act and the *Qui Tam* States' Statutes, Relator seeks to recover, on behalf of the United States and the *Qui Tam* States, damages and civil penalties arising from the submission of false or fraudulent claims supported by false or misleading statements that the Defendants caused to be submitted for payments, and that Defendants knew or should have known were going to be paid ultimately by government healthcare programs, including the Medicare, Medicaid, and other government-funded programs.

B.      **Medicare**

78.      Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*., establishes the federal Medicare health insurance program for the elderly and disabled.  Medicare operates by authorizing payments for inpatient and outpatient healthcare services to "providers," such as hospitals, skilled nursing facilities, outpatient rehabilitation facilities, and home health agencies. 42 U.S.C. §§ 1395cc(a), 1395x(u).

79.      The Centers for Medicare and Medicaid Services ("CMS") administers Medicare on behalf of the Secretary.

80.      For all services and items, Medicare coverage is limited to services that are medically "reasonable and necessary," *inter alia*, "[f]or the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member," "[i]n the case of cardiovascular disease screening tests for the early detection of cardiovascular disease or abnormalities associated with an elevated risk for that disease …," or "[i]n the case of additional preventive services not otherwise described in this title, subject to the conditions and limitation specified in § 410.64 of this chapter."  42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1), (13), (15).

81.      Although "reasonable and necessary" is not defined in the Act, Congress has vested final authority in the Secretary to determine what items or services are "reasonable and necessary." *See* 42 U.S.C. § 1395ff(a); *Heckler v. Ringer*, 466 U.S. 602, 617 (1984).  Consistent with this authority, the Secretary has promulgated regulations relating to the "reasonable and necessary" requirement – the National Coverage Determinations, discussed *infra*.

82.      "A private physician's word on medical necessity is not dispositive." *Moore v. Reese*, 637 F.3d 1220, 1255 (11th Cir. 2011).  *See also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to

accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").

### 1.    Medicare Coverage of Outpatient Diagnostic Testing and Procedures

83.    Medical diagnostic imaging-based services include a variety of specialized imaging procedures used in the detection, diagnosis and/or treatment of diseases such as cancer, muscle trauma, bone disease, cardiac disease, stroke, gastrointestinal, gynecological and neurological disorders.

84.    The fact that a treating physician orders a diagnostic service is not determinative as to its medical reasonableness or necessity.

85.    The procedures for which pre-authorization determinations of medical reasonableness and necessity are made include, but are not limited to, Computer Axial Tomography ("CAT" or "CT") scans, Computer Tomography Angiography ("CTA"), Coronary CT Angiography ("CCTA"), Magnetic Resonance Imaging ("MRI") scans, Magnetic Resonance Angiography ("MRA"), nuclear Myocardial Perfusion Imaging ("MPI" or "Cardiac Stress Test"), Positron Emission Tomography ("PET") scans, and obstetric ultrasounds.

86.    Each diagnostic procedure is identified by a Current Procedural Terminology ("CPT") code, which is a uniform coding system that assigns codes to various types of medical, surgical and diagnostic services performed by healthcare providers.  The CPT codes were developed by the American Medical Association and are an accepted means of reporting such services to government and private health insurance programs.

87.    The CPT codes discussed *supra*, are a component of the Healthcare Common Procedure Coding System ("HCPCS")*,* which are the codes used by healthcare providers when

submitting claims for payment by insurance plans, including Medicare and Medicaid carrier contractors.

88.     These CPT codes also are used in connection with the pre-authorization determinations as to whether a diagnostic service ordered by a treating physician is medically reasonable and necessary.

89.      There are over 150 CPT codes for outpatient diagnostic services for which CareCore processes pre-authorization requests.

90.     With regard to these CPT codes for outpatient diagnostic services, CMS has promulgated National Coverage Determinations ("NCDs") for CT scans (NCD for Computed Tomography (220.1)); MRIs (NCD for Magnetic Resonance Imaging (220.2));  MRAs (NCD for Magnetic Resonance Angiography (220.2)); PET scans (NCD for PET Scans (220.6));  MPIs (NCD for PET for Perfusion of the Heart (220.6.1)); and obstetric ultrasounds (NCD for Ultrasound Diagnostic Procedures (220.5)).

91.     As to CTAs, CMS has not promulgated an NCD, but, has determined that the medical necessity decisions "should be made by local contractors through a local coverage determination process or case-by-case adjudications."  *See* NCD for Computed Tomography (220.1), at F and *see* Pub 100-3, Transmittal 85, dated 06/27/2008, Change Request 6098.

92.     As to CT Scans, CMS has determined as follows:

B.  Determining Whether a CT Scan Is Reasonable and Necessary

Sufficient information must be provided with claims to differentiate CT scans from other radiology services and to make coverage determinations. Carefully review claims to insure that a scan is reasonable and necessary for the individual patient; *i.e.,* the use must be found to be medically appropriate considering the patient's symptoms and preliminary diagnosis.

There is no general rule that requires other diagnostic tests to be tried before CT scanning is used. However, in an individual case

> the contractor's medical staff may determine that use of a CT scan
> as the initial diagnostic test was not reasonable and necessary
> because it was not supported by the patient's symptoms or
> complaints stated on the claim form; *e.g.*, "periodic headaches."

> Claims for CT scans are reviewed for evidence of abuse which
> might include the absence of reasonable indications for the scans,
> an excessive number of scans or unnecessarily expensive types of
> scans considering the facts in the particular cases.

NCD for Computed Tomography (220.1), at B (Version 2), effective 3/12/2008.

93.    As to MRIs, CMS has determined that "the services must be reasonable and necessary for the diagnosis or treatment of the specific patient involved."  NCD for Magnetic Resonance Imaging (220.2), at B.1 (Version 5), effective 7/7/2011.

94.    As to MRAs, CMS similarly has determined that "the services must be reasonable and necessary for the diagnosis or treatment of the specific patient involved."  NCD for Magnetic Resonance Imaging (220.2), at B.2 (Version 5), effective 7/7/2011.

95.    With regard to PET scans, CMS requires that for such scans to be covered by Medicare, *inter alia*, "[t]he ordering physician is responsible for documenting the medical necessity of the study and ensuring that it meets the conditions specified in the instructions." NCD for PET Scans (220.6), at II.C (Version 3), effective 1/28/2005.

96.    With regard to MPIs, CMS requires the following:

> PET scans performed at rest or with pharmacological stress used
> for noninvasive imaging of the perfusion of the heart for the
> diagnosis and management of patients with known or suspected
> coronary artery disease using the FDA-approved
> radiopharmaceutical Rubidium 82 (Rb 82) [or Ammonia N-13] are
> covered, provided the requirements below are met:

> The PET scan, whether at rest alone, or rest with stress, is
> performed in place of, but not in addition to, a single photon
> emission computed tomography (SPECT); or

> The PET scan, whether at rest alone or rest with stress, is used
> following a SPECT that was found to be inconclusive. In these

- 33 -

cases, <u>the PET scan must have been considered necessary in order to determine what medical or surgical intervention is required to treat the patient.</u>  (For purposes of this requirement, an inconclusive test is a test(s) whose results are equivocal, technically uninterpretable, or discordant with a patient's other clinical data and must be documented in the beneficiary's file.)

NCD for PET for Perfusion of the Heart (220.6.1), at 1 & 2 (Version 2), effective 4/3/2009 (emphasis added).

97.     With regard to obstetric ultrasounds, CMS provides:

Ultrasound diagnostic procedures are listed below and are divided into two categories. Medicare coverage is extended to the procedures listed in Category I. Periodic claims review by the intermediary's medical consultants should be conducted to ensure that the techniques are medically appropriate and the general indications specified in these categories are met. Techniques in Category II are considered experimental and should not be covered at this time.

NCD for Ultrasound Diagnostic Procedures (220.5), at A (Version 3), effective 5/22/2007.

Several types of ultrasounds related to pregnancy are listed under Category I.  CMS also provides as follows:

Uses for ultrasound diagnostic procedures not listed in Category I or II above are left to local contractor discretion. In view of the rapid changes in the field of ultrasound diagnosis, uses for ultrasound diagnostic procedures other than those listed under Categories I and II should be carefully reviewed before payment. Medical justification may be required.

*Id.* at D.

## 2.     Medicare's Requirements of Carrier Contractors

98.     Pursuant to Section 1874A of the Social Security Act, Medicare may contract with eligible entities, including carrier contractors, to perform certain functions or parts of those functions (or, to the extent provided in a contract, to secure performance thereof by other entities), *see* 42 U.S.C. § 1395kk-1(a), such as payment functions (including the function of

- 34 -

developing local coverage determinations, as defined in section 1395ff(f)(2)(B)), provider services functions, and functions relating to services furnished to individuals entitled to benefits under part A of this subchapter or enrolled under part B of this subchapter, or both, as follows:

(A) Determination of payment amounts.—Determining (subject to the provisions of section 1395oo of this title and to such review by the Secretary as may be provided for by the contracts) the amount of the payments required pursuant to this title to be made to providers of services, suppliers and individuals.

(B) Making payments.—Making payments described in subparagraph (A) (including receipt, disbursement, and accounting for funds in making such payments).

(C) Beneficiary education and assistance.—Providing education and outreach to individuals entitled to benefits under part A of this subchapter or enrolled under part B of this subchapter, or both, and providing assistance to those individuals with specific issues, concerns, or problems.

(D) Provider consultative services.—Providing consultative services to institutions, agencies, and other persons to enable them to establish and maintain fiscal records necessary for purposes of this title and otherwise to qualify as providers of services or suppliers.

(E) Communication with providers.—Communicating to providers of services and suppliers any information or instructions furnished to the Medicare administrative contractor by the Secretary, and facilitating communication between such providers and suppliers and the Secretary.

(F) Provider education and technical assistance.—Performing the functions relating to provider education, training, and technical assistance.

(G) Additional functions.—Performing such other functions, including (subject to paragraph (5)) functions under the Medicare Integrity Program under section 1893, as are necessary to carry out the purposes of this title.

42 U.S.C. § 1395kk-1(a)(4).[1]

---

[1]  Although this section refers to "Medicare administrative contractors," the section was amended such that as of October 1, 2005, any reference to a fiscal intermediary or carrier under title XI or XVIII of the Social Security Act (or any regulation, manual instruction, interpretative rule, statement of policy, or guideline issued to carry out such titles) shall be deemed a reference to a Medicare administrative contractor.  *See* Vol. II, P.L. 108-173, §911(d), (e).

99.     As provided for in the Medicare statute, carrier contractors are obligated to perform functions under the Medicare Integrity Program, 42 U.S.C. § 1395kk-1(a), which include any or all program integrity functions described in 42 C.F.R. § 421.304, which include "(a) [c]onducting medical reviews, utilization reviews, and reviews of potential fraud related to activities of providers of services…" and "(b) [a]uditing, settling and determining cost report payments for providers of services, or other individuals or entities. . . as necessary to help ensure proper Medicare payment."   *See also* 42 C.F.R. § 421.200 (specifying carrier contractor functions).

100.     Carrier contractors, such as the Defendant Insurers, are required to "identify and verify potential errors to produce the greatest protection to the Medicare program."   Medicare Program Integrity Manual § 2.1B.

101.     In addition, carrier contractors, such as the Defendant Insurers, are "responsible for deterring and detecting fraud and abuse."   CMS Medicare Administrative Contractor Statement of Work § C.5.13.

**C.     Medicaid**

102.     The Medicaid Program, as enacted by Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, is a joint federal-state program that provides health care benefits for certain groups, primarily indigent and disabled individuals.

103.     This cooperative federal-state Medicaid program directs federal funding to participating states to provide medical assistance to "families with dependent, … [and] aged, blind and disabled individuals, whose income and resources are insufficient to meet the costs of **necessary** medical services."   42 U.S.C. § 1396-1 (emphasis added).

104.    The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).

105.    The Medicaid statute requires each participating state to implement and administer a state plan for medical assistance services which contains certain specified minimum criteria for coverage and payment of claims.  42 U.S.C. §§ 1396, 1396a(a)(10).

106.    To prevent Medicaid from paying for unnecessary services, 42 U.S.C. § 1396a(a)(30)(A) requires states to maintain "methods and procedures" to "safeguard against unnecessary utilization" of Medicaid care and services.

107.    Although the standard of "medical necessity" is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme. *See, e.g., Beal v. Doe*, 432 U.S. 438, 444 (1977).

108.    It is consistent with Medicaid objectives "for a State to refuse to fund *unnecessary* – though perhaps desirable – medical services."  *Beal*, 432 U.S. at 444-45 (emphasis in original).

109.    Each state can limit Medicaid services, if it chooses, to meet a state-created definition of medical necessity.  *See* 42 C.F.R. § 440.230(d) ("The [Medicaid] agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.").

110.    Many states have further defined medical necessity related to coverage under Medicaid by state statute, code or other regulatory provision.

111.    Further, state Medicaid agencies are required to perform audits to implement a Statewide surveillance and utilization control program:

> The Medicaid agency must implement a statewide surveillance and
> utilization control program that—

(a) Safeguards against unnecessary or inappropriate use of Medicaid services and against excess payments;

(b) Assesses the quality of those services;

(c) Provides for the control of the utilization of all services provided under the plan in accordance with subpart B of this part; and

(d) Provides for the control of the utilization of inpatient services in accordance with subparts C through I of this part.

42 C.F.R. § 456.3.

112.    As with Medicare, state Medicaid agencies can delegate their duties to private insurance carrier contractors, such as the Defendant Insurers, with which they also contract to administer health plans under state Medicaid managed care programs.  *See* 42 C.F.R. § 434.6. Those delegated duties may include the determination as to whether outpatient diagnostic services are medically necessary and appropriate.

113.    Each Managed Care Organization ("MCO"), like the Insurer Defendants, must "oversee[] and [be] accountable for any functions and responsibilities that it delegates to any subcontractor," like CareCore.  42 C.F.R. § 438.230(a).

114.    Additionally, each MCO must evaluate a subcontractor's ability to perform activities to be delegated in advance of any delegation, must enter into a written agreement that "provides for revoking delegation or imposing other sanctions [like the $3,000 fines for cases not processed timely] if the subcontractor's performance is inadequate" and must continue to "monitor[] the subcontractor's performance on an ongoing basis and subject[] it to formal review."  42 C.F.R. § 438.230(b)(1), and (b)(2)(ii) and b(3).

115.    Further, each MCO "must have administrative and management arrangements or procedures, including a mandatory compliance plan, that are designed to guard against fraud and abuse."  42 C.F.R. § 438.608(a).

116.   In addition to the above, the *Qui Tam* States have enacted state Medicaid laws or regulations governing, among other things, medical necessity, program quality assurance/auditing functions of carrier contractors, and subcontractor requirements.   These include:

a.   California:

   i.   CAL. WELF. & INST. CODE §§ 14000; 14059.5;  CAL CODE REGS. tit. 22, § 51003 (medical necessity);

   ii.   CAL. WELF. & INST. CODE § 14087.98 (quality assurance); and

   iii.   CAL. WELF. & INST. CODE § 14089 (subcontractor requirements).

b.   Colorado:

   i.   COLO. REV. STAT. ANN. §25.5-5-102, 10 COLO. CODE REGS. § 2505-10 8.076.1.8 (medical necessity); and

   ii.   10 COLO. CODE REGS. § 2505-10 8.076, 8.079 (Program Integrity/quality assurance, including subcontractor requirements).

c.   Connecticut:

   i.   CONN. GEN. STAT. § 17b-259b (medical necessity);

   ii.   Conn. Gen. Stat. § 17b-28b (contracting);

   iii.   CONN. GEN. STAT. § 17b-267 (quality assurance/auditing).

d.   Delaware:

   i.   16 DEL. ADMIN. CODE MED 1.14, 1.21.3 and Appendix H (Delaware Medical Assistance Program General Policy Manual), 16 DEL. ADMIN. CODE MED 1.22.1.2.24 (medical necessity); and

   ii.   16 DEL. ADMIN. CODE MED 2.1 (contracting for administration).

e.   District of Columbia:

   i.   D.C. CODE § 4-110 (1) (medical necessity); and

   ii.   D.C. MUN. REGS. tit. 29, § 5313 (subcontracting).

f.   Florida:

      i.   FLA. ADMIN. CODE ANN. r. 59G-1.010(166) (medical necessity);

     ii.   FLA. ADMIN. CODE ANN. r. 59G-8.100(9) (quality assurance/auditing); and

    iii.   FLA. ADMIN. CODE ANN. r. 59G-8.100(2)(c), Fla. Admin. Code Ann. r. 59G-8.100(13) (subcontractor requirements).

g.   Georgia:

      i.   GA. CODE ANN. §§ 33-20A-31(7), 49-4-141(5) (medical necessity);

     ii.   GA. CODE ANN. § 49-4-151 (quality assurance/auditing);

    iii.   GA. CODE ANN. § 49-4-142(a) (subcontractor requirements); and

    iv.   *See generally* Amended and Restated Contract Between the Georgia Department of Community Health and Care Management Organization for Provision of Services to Georgia Families, Contract No. Amendment #12, at http://dch.georgia.gov/sites/dch.georgia.gov/files/imported/vgn/images/portal/cit_1210/27/43/164261788CMO_Restatement_12-General.pdf (last accessed Jan. 31, 2013).

h.   Hawaii:

      i.   HAW. REV. STAT. § 432E-1.4;   HAW. ADMIN. RULES § 17-1721.1-52 (medical necessity).

i.   Illinois:

      i.   215 ILL. COMP. STAT. 105/2; ILL. ADMIN. CODE, tit. 89, § 140.2 (medical necessity); and

     ii.   215 ILL. COMP. STAT. 134/80 (quality assurance/auditing).

j.   Indiana:

      i.   IND. ADMIN. CODE tit. 405, r. 1-1-1(g); IND. ADMIN. CODE tit. 407, r. 3-1-1(a)(3) (medical necessity); and

     ii.   IND. CODE § 12-15-12-21 (contracting with managed care organization and quality assurance); IND. ADMIN. CODE tit. 405, r. 1-1-1(g) (contractors).

k.   Iowa:

      i.   IOWA CODE ANN. § 249A.47; IOWA ADMIN. CODE r. 441-78.1 (249A) (medical necessity); and

     ii.   IOWA CODE ANN. § 249A.4 (contracting).

l.   Louisiana:

    i.   LA. ADMIN. CODE tit. 50, pt. I, § 1101 (medical necessity definition and criteria);

    ii.   LA. REV. STAT. ANN. §§ 40:2211, 40:2221 (contracting); and

    iii.   LA. ADMIN. CODE tit. 50, pt. I, § 3305 (contracting and utilization management).

m.  Maryland:

    i.   MD. REGS. CODE 10.09.62.01(B)(107), (109) (medical necessity);

    ii.   MD. CODE ANN., Health-General § 15-103(b)(9); MD. REGS. CODE 10.09.65.03 (quality assurance/auditing); and

    iii.   MD. REGS. CODE 10.09.65.17 (subcontractor requirements).

n.   Massachusetts:

    i.   MASS. REGS. CODE tit. 130, § 450.204 (medical necessity);

    ii.   MASS. GEN. LAWS ch. 118E, § 12; MASS. REGS. CODE tit. 956, § 2.04 (contracting); and

    iii.   MASS. REGS. CODE tit. 956, § 2.06 (managed care organization quality assurance).

o.   Michigan:

    i.   MICH. COMP. LAWS ANN. § 400.111a (medical necessity);

    ii.   MICH. COMP. LAWS ANN. § 333.26368.III.A.12 (quality assurance/ auditing as to subcontractors' arrangements with Medicaid managed care companies); and

    iii.   MICH. COMP. LAWS ANN. § 333.26368.IV.H (ability to subcontract duties).

p.   Minnesota:

    i.   MINN. STAT. ANN. § 256B.04 (cost containment and medical necessity); MINN. R. 9505.0175 Subp. 25 (medical necessity defined); and

    ii.   MINN. R. 9500.1460 (contracting and quality assurance); MINN. R. 9506.0400   (quality assurance requirements).

q.  Montana:

       i.  MONT. CODE. ANN. § 53-6-101(9) (necessary medical services);  MONT. ADMIN. R. 37.82.102(18) (medically necessary defined); and

      ii.  MONT. CODE ANN. § 53-6-705(8) (quality assurance required of managed care entity); MONT. ADMIN. R. 37.85.410 (designated review organization to determine medical necessity); MONT. ADMIN. R. 37.85.414(3) (designated review organization to perform quality control).

r.  Nevada:

       i.  NEV. REV. STAT. 428.015 (medically necessary care); and

      ii.  NEV. REV. STAT. 428.030 (contracting).

s.  New Jersey:

       i.  N.J. STAT. ANN. § 30:4D-5 (medical necessity);

      ii.  N.J. STAT. ANN. § 30:4D-12; and Contract Template between NJ Department of Human Services and Medicaid Contractor, at p. 48, http://www.nj.gov/humanservices/dmahs/info/resources/care/hmo-contract.pdf. (quality assurance/auditing); and

     iii.  N.J. STAT. ANN. § 30:4D-7(p),(q), (r); N.J. STAT. ANN. § 30:4D-7b - 7c ; N.J. STAT. ANN. § 30:4D-8;  N.J. STAT. ANN. § 30:4D-9 (ability to subcontract duties).

t.  New Mexico:

       i.  N.M. STAT. ANN. § 27-2-12.6 (medically necessary services); N.M. ADMIN. CODE tit. 8, § 300.1.9 (medically necessary) N.M. ADMIN. CODE tit. 8, § 301.5.9 (insuring recipients receive only necessary services);

      ii.  N.M. ADMIN. CODE tit. 8, § 302.5 (quality control, prior authorization and utilization review); and

     iii.  N.M. ADMIN. CODE tit. 8, § 300.6.9 (administration through contractors); and

     iv.  N.M. ADMIN. CODE tit. 8, § 302.2.10(E) (contractors).

u.  New York:

       i.  N.Y. SOC. SERV. LAW § 365-a (medical necessity);

      ii.  N.Y. SOC. SERV. LAW § 364-j(8), N.Y. COMP. CODES R. & REGS. tit. 10, § 98-1.12 (quality assurance/auditing); and

       iii. N.Y. Comp. Codes R. & Regs. tit. 10 § 98-1.11 (subcontractor requirements).

v. North Carolina:

       i. N.C. Gen. Stat. § 108A-55(a) (necessary medical care); N.C. Gen. Stat. § 108C-7 (medical necessity criteria); N.C. Admin. Code tit. 10A, r. 22F.0104; and

       ii. N.C. Admin. Code tit. 10A, r. 22A.0101 (fiscal agents under contract are required to conduct utilization reviews).

w. Oklahoma:

       i. Okla. Stat. tit. 56, § 1002(7) (necessary medical services); Okla. Stat. tit. 56, § 1011.2 (medically necessary services); Okla. Admin. Code § 317:30-3-1(f) (medical necessity standards); and

       ii. Okla. Stat. tit. 56, § 1010.3 (contracting for claims administration).

x. Rhode Island:

       i. R.I. Gen. Laws § 40-8-1(b) (adequate medical care and treatment);  R.I. Admin. Code 39-1-142:1(II) (medical necessity defined); and

       ii. R.I. Gen. Laws § 40-8-29 (contracting); R.I. Gen. Laws § 5-37.3-3 (managed care contracting and utilization review).

y. Tennessee:

       i. Tenn. Code Ann. § 71-5-144 (medical necessity); and

       ii. Tenn. Code Ann. § 71-5-130 (quality assurance/auditing and the authority to subcontract).

z. Texas:

       i. 1 Tex. Admin. Code § 353.2(57) (defining medical necessity);

       ii. Tex. Gov't Code Ann. §§ 533.002, 533.005 (contracting); and

       iii. 1 Tex. Admin. Code § 353.417 (managed care quality assessment required).

aa. Virginia:

     i.  VA. CODE ANN. 38.2-5800 (medical necessity); 12 VA. ADMIN. CODE §
30-50-10 (prior authorization is required for outpatient diagnostic tests);
and

    ii.  12 VA. ADMIN. CODE § 30-10-530 (utilization, quality control and
contracting with health maintenance organizations).

  bb. Washington:

     i.  WASH. REV. CODE § 74.09.010 (10) (necessary medical services); WASH.
ADMIN. CODE § 182-500-0085 (prior authorization requirement based
upon medical necessity); and

    ii.  WASH. ADMIN. CODE § 182-538-063 (subcontracting).

  cc. Wisconsin:

     i.  WISC. STAT. § 49.45(1) (appropriate health care); and

    ii.  WISC. STAT. § 49.45(2)(b) (subcontracting and auditing).

**D.    TRICARE/CHAMPUS**

117.    In 1967, the Department of Defense created the Civilian Health and Medical
Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical
program created by Congress.  10 U.S.C. § 1071.  CHAMPUS beneficiaries include active
military personnel, retired personnel, and dependents of both active and retired personnel.  *Id*.

118.    In 1995, the Department of Defense established TRICARE, a managed healthcare
program, which operates as a supplement to CHAMPUS.  *See* 32 C.F.R. § 199.4, 199.17(a).
Since the establishment of TRICARE in 1995, both programs are frequently referred to
collectively as TRICARE/CHAMPUS, or simply "TRICARE."  The purpose of the TRICARE
program is to improve healthcare services to beneficiaries by creating "managed care support
contracts that include special arrangements with civilian sector health providers."  32 C.F.R.
§ 199.17(a)(1).  The TRICARE Management Activity ("TMA") oversees this program.

119.     TRICARE's governing regulations, like those of Medicare and Medicaid, are based upon "medical necessity."  32 C.F.R. § 199.4 ("the CHAMPUS Basic Program will pay for medically necessary services and supplies required in the diagnosis and treatment of illness or injury").  Under TRICARE's governing regulations, services provided must be "furnished at the appropriate level and only when and to the extent medically necessary" and such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation … to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care."  32 C.F.R. § 199.6(a)(5).  In this regard, similar to Medicare and Medicaid, services provided at a level higher than the medically necessary are improper and violate TRICARE's governing regulations.

E.     **Federal Employee Health Benefits Program**

120.     The Federal Employee Health Benefits Program ("FEHBP") is a federally funded medical insurance program for federal employees, retirees, their spouses and unmarried dependent children under the age of 22, administered by the Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, et seq.  Through the OPM, the Government contracts with private health plans, like the Defendant Insurers, to administer health benefits for its employees.  Monies for the FEHBP are maintained in the Employees' Health Benefits Fund ("Health Fund") and are administered by OPM.  5 U.S.C. § 8909.  Federal agencies and their employees contribute to the Health Fund to cover the total cost of health care premiums.  5 U.S.C. § 8906.  The monies from the Health Fund are used to reimburse the health plans for claims they pay on behalf of FEHBP beneficiaries.

121.     Like Medicare Part B and TRICARE, FEHBP will not cover any treatment or surgery that is not medically necessary.  5 U.S.C. § 8902(n)(1)(A).

- 45 -

V.    **CARECORE'S AND THE DEFENDANT INSURERS' FRAUDULENT CONDUCT**

   A.    **Background on CareCore's Operations and Participation in Government Healthcare Programs**

   122.   CareCore marketed, sold, and performed and continues to market, sell, and perform pre-authorization services for diagnostic tests and procedures that are covered and paid for by various government health insurance programs, including Medicare and Medicaid.

   123.   CareCore specifically contracts with third-party insurance companies, such as the Defendant Insurers, to perform pre-authorization services by providing medical reasonableness and necessity determinations for the outpatient diagnostic testing services ordered by treating physicians for approximately 50 million covered lives, including Medicare and Medicaid beneficiaries.

   124.   CareCore's Medical Directors are physician reviewers who hold current unrestricted licenses as doctors of medicine (M.D.) or osteopathic medicine (D.O.).  Medical Director physicians have authority to render initial adverse determinations, *i.e.*, to deny requests for pre-authorization/pre-certification for diagnostic services, and to serve as a resource to clinical review staff.  Medical Director physicians who render final adverse determinations are board certified in the area of specialty in which they render their professional opinions.  Medical Director physicians consider the needs of individual patients and characteristics of the local delivery system when applying the clinical criteria for approval of a diagnostic test or procedure.

   125.   CareCore's Clinical Reviewers are licensed healthcare nurses, registered nurses or licensed practical nurses (R.N.s or L.P.N.s), and radiology technicians under the supervision of R.N.s and/or L.P.N.s, who are trained in the use of utilization review criteria (sometimes also referred to as the "Nursing Criteria" or "Nursing Pathway") to assess and to screen requests for pre-authorization of diagnostic services, which requests may have been processed previously by

clerical support staff to collect demographic data. Clinical Reviewers consider the needs of individual patients and characteristics of the local delivery system when applying the clinical criteria.

126.    The Clinical Reviewer nurses have the authority to certify (*i.e.*, approve) requests when the clinical information provided is consistent with the utilization review criteria.

127.    When the utilization review criteria are not met, CareCore's Clinical Reviewers are not authorized to deny a request for pre-authorization.

128.    CareCore has established Policies and Procedures requiring that preauthorization requests for diagnostic services for which the supporting clinical information does not meet utilization review criteria are electronically transferred to a Medical Director for additional review, *i.e.*, they are assigned "O" Status, signifying "**O**ut" for physician review.

129.    Pre-authorization requests that require further review by Medical Directors (*i.e.*, "O" Status cases) are transferred and stored in an electronic transfer queue, known as the "doctor queue."

130.    Absent the fraud described herein, CareCore's service was supposed to operate as follows:

        a.    When a treating physician orders a diagnostic test or procedure for a patient, the physician would contact or have his/her staff contact CareCore to request pre-authorization of the diagnostic test or procedure for coverage by the patient's insurance carrier, providing CareCore with the patient's pertinent medical history and signs and symptoms purportedly necessitating such test or procedure.

b.    Initially, CareCore would have the case evaluated by one of its Clinical Reviewer nurses.

c.    Based upon the patient's information provided, if the Clinical Reviewer deemed the diagnostic service to be medically reasonable and necessary, as per the utilization review criteria, the Clinical Reviewer would approve the request and pre-authorize the test or procedure.

d.    If, however, based upon the provided information and the Clinical Reviewer's own qualifications as a nurse, the Clinical Reviewer could not approve the request for the diagnostic service because he/she did not deem the test or procedure to be medically reasonable and necessary, as per the utilization review criteria, then, the case would be placed in the doctor queue to be reviewed by one of CareCore's Medical Directors.  As noted *supra*, importantly, CareCore Clinical Reviewers are not authorized to deny pre-authorization requests – they are authorized only to approve the request or to place the request into the doctor queue.

e.    Once a case is placed into the "doctor queue" by the Clinical Reviewer, a Medical Director is supposed to determine whether or not the ordered diagnostic test or procedure is medically reasonable and necessary, using his/her medical expertise and, if needed, by obtaining additional information from the treating physician.  The Medical Director would then either accept or deny the pre-authorization request for the diagnostic service.

131.    For cases designated "regular" priority, which are most of the cases, CareCore is required, pursuant to its contracts with the Defendant Insurers, to approve or deny the pre-authorization request within two days.  Regular priority cases are designated with an "R" in the priority field of CareCore's on-line Pre-Authorization Database.

132.    For cases that are deemed "urgent," a pre-authorization request must be approved or denied within three hours.  Urgent priority cases are designated with a "U" in the priority field of CareCore's on-line Pre-Authorization Database.

133.    If CareCore fails to process a pre-authorization request within these time constraints, pursuant to its contracts, CareCore may be fined $3,000 for each untimely processed request.

134.    Since 2005, when Relator commenced his employment, CareCore has processed approximately 5,000 to 10,000 pre-authorization requests for diagnostic services (also known as "cases") per day, via telephone requests alone.  When requests received via CareCore's website and written/faxed requests are also included, CareCore processes a total of 15,000 to 20,000 cases on a daily basis.

135.    Although CareCore touts its program as "Evidence-based Specialty Benefits Management," as detailed herein, there is no evidentiary basis for the type of "auto-approval" of cases that CareCore "Pads" daily, as per the Padding Scheme.

136.    The Padding Scheme described herein, under which cases (already determined to be **not** subject to pre-authorization by a Clinical Reviewer) are removed from the doctor queue and simply approved by another Clinical Reviewer without any review by a Medical Director, not only violated CareCore's own internal policies and procedures, but, more importantly, resulted in the submission of false claims for payment of diagnostic services that were not

properly determined to be medically reasonable and necessary in violation of the reimbursement rules and regulations governing government healthcare programs.

137.   All such false claims caused to be submitted by CareCore's fraudulent conduct violate the Federal False Claims Act and the State *qui tam* statutes.

**B.   CareCore's Padding Scheme – In Detail**

**1.   Pre-Authorization Request Intake**

138.   If a treating physician decides that a patient requires a diagnostic test or procedure, if that patient is a beneficiary of one of the government programs that contracts with a plan carrier contractor that in turn contracts with CareCore (or if the patient is a direct beneficiary of a private insurer that contracts with CareCore), and if the diagnostic service pertains to one of the CPT codes for which pre-authorization is required, then, the doctor or his/her office must communicate with CareCore to obtain pre-authorization for the diagnostic service in order to ensure that the costs of the test or procedure will be covered by the government program or private insurer.

139.   This communication can be accomplished by telephoning CareCore, faxing CareCore, or contacting CareCore via its website.  A record of all three means of communication is recorded and maintained by CareCore – telephone calls are audiotaped through CareCore's Avaya system (since October 2012, the new Cisco telephone system has been in effect), the faxes are maintained in hard copy and the website requests are kept electronically.

140.   When a pre-authorization request comes in by telephone, it is routed to the Clinical Reviewers by the call intake department personnel.  The intake department personnel, who are non-clinical clerks, collect the demographic information and the applicable CPT code for the case and "build" the request for the Clinical Reviewers, *i.e.*, the intake personnel put the case into the nurse queue on CareCore's Pre-Authorization Database.

141.    The intake department also receives the facsimile requests for pre-approval, which they similarly "build" and route to the Clinical Reviewers by placing those cases into the nurse queue.

142.    Requests for pre-authorization via the CareCore website are not handled by intake personnel, but rather are sent directly to the nurse queue automatically.

143.    CareCore's approximately 200 to 250 Clinical Reviewer nurses are expected simultaneously to handle telephone, facsimile and website requests for pre-authorization – some days up to 20,000 cases.  All relevant information is entered into CareCore's centralized Pre-Authorization Database utilizing the IGel computer system.  Since most Clinical Reviewers work from home, their computers have no hard drives for HIPAA reasons.

144.    Following intake by telephone, facsimile or website, a case is reviewed for pre-authorization at the nurse/Clinical Reviewer level and either approved, or, if the Clinical Reviewer is unable to pre-approve the diagnostic service because it does not appear medically reasonable or necessary to the nurse, as per the utilization review criteria, then, the case is sent out for review by a Medical Director (*i.e.*, it is assigned "O" Status), also known as placing the case in the "doctor queue."

145.    Included among the reasons why a Clinical Reviewer would be unable to approve a request are the following:  (a) no prior basic imaging was done (*i.e.*, no x-ray); (b) the treatment up to that point failed to meet the duration requirements for conservative management (*e.g.*, treatment with non-steroidal anti-inflammatory drugs for at least four weeks); or (c) the member was imaged within the past 3 weeks.

146.  Clinical Reviewers are not permitted to deny requests.  They must either approve a request for pre-authorization or place it in the doctor queue for higher level review by a Medical Director.

### 2.  Proper Pre-Authorization Approvals and Denials

147.  When a Clinical Reviewer approves a request for pre-authorization, according to CareCore's procedures, he/she enters in the "Journal Entry" field the basis for approving the request and places an "A" in the "Case Status" field on the Edit/View page of the Pre-Authorization Database, indicating that the case is Approved.  The "Comments" field on the Case History page will reflect the name of the user who approved the case and that individual's degree, R.N. or L.P.N. (or in cases where a Medical Director approved the case, M.D. or D.O.).

148.  When a case is sent to the doctor queue by the Clinical Reviewer, he/she selects an "O" in the "Case Status" field on the Edit/View page of the Pre-Authorization Database, signifying that the case is "Out for MD review."  Also, the "Comments" field on the Case History page will reflect which user – by necessity, always a Clinical Reviewer – "manually changed the status to 'O.'"

149.  Once a case is placed in the "doctor queue," a Medical Director is then supposed to review the case and either approve or deny the request for pre-authorization of the diagnostic service.  Upon review, the Medical Directors also enter information into the CareCore Pre-Authorization database in the aforementioned "Case Status" and "Journal Entry" fields on the Case History page:



In this example, Radiology Management Case Nbr 1027818213 was a pre-authorization request made on May 17, 2011 for a "Thyroid Carcinoma Metastases u[ptake]" ordered by an endocrinologist for Patient ID PP05906H, who is on Medicaid, to be done at SLR Diagnostic Radiology, P.C.  The Clinical Reviewer nurse, M. Romero, L.P.N. (MROMERO-LPN), had sent the case out for doctor review on May 18, 2011.  The pre-authorization request was approved on May 19, 2011 by L. Gee, M.D.

150.    If the doctor approves the case, he/she would select "A" in the Case Status field and the Comments would reflect that the doctor "manually changed the status to 'A'" and his/her name would appear with an "M.D." designation in the corresponding UserID field, as shown below for the same example described in the preceding paragraph:



This pre-authorization request was processed properly.

151.    If the Medical Director denies the request, he/she would select "D" in the Case Status field and the Comments would reflect that the doctor "manually changed the status to 'D'" and his/her name would appear with an "M.D." designation in the corresponding UserID field, as shown below in the screen shots from CareCore's Pre-Authorization Database for Radiology Management Case Nbr 1027816281 for a Medicare patient whose doctor ordered an MRI of the patient's cervical spine on May 17, 2011, but which request for pre-authorization was denied on May 19, 2011, by M. Cyrus, M.D.:





The Medical Director will also enter in the Journal Entry field seen on the first screen above the basis for denying the pre-authorization request, *i.e.*, the "NON-CERTIFICATION REASON." Here, the Medical Director wrote that the requested MRI was not medically reasonable or necessary because based on the information received and reviewed, "[t]he history is neck pain. This test might be needed if the member did not get better after taking medicine to decrease pain and swelling for 4 weeks."

### 3.   Improper Auto-Approved (*i.e.*, Padded) Pre-Authorization Requests

152.   Padding was defined by CareCore as auto-approving requests for pre-authorization for diagnostic services that already were in the doctor queue. That is, for a case in the doctor queue, a nurse/Clinical Reviewer initially had reviewed the request for pre-authorization and determined that he/she was unable approve it at their nursing level (as per the utilization review criteria), and he/she had placed it in the doctor queue. But, before a Medical Director had a chance to review the case, because it was about to exceed the contracted turn-

around time (*i.e.*, two days for regular cases and three hours for urgent cases), a nurse/Clinical Reviewer (ordinarily a different one than he/she who had put the case in the doctor queue initially) would go into the doctor queue and auto-approve the case.

153.    When a Clinical Reviewer nurse reviewer gets a case, it comes to him/her on the S page or Edit/View screen as seen in left hand side of the screen shot in paragraph 149 above and the left-hand side of the first of the two screen shots in paragraph 151 above.

154.    The first thing that the Clinical Reviewer clicks on to work the case is the "Review" icon at the top of the S page.  This takes the nurse to the utilization review criteria, also known as the Nursing Criteria/Pathway, which brings up the clinical questions the nurse is supposed to ask the caller/requester.  If the case is a written request (sent via fax), the patient's clinical information included in the fax appears.  Similarly, if the case is a website request, the patient's clinical information appears as typed in by the requester.

155.    After the Nursing Criteria/Pathway questions, there is a space for the reviewer to enter a comment, but this is usually limited to 40-80 characters.  Any information entered into this comment field appears in the Journal Entry page after the reviewer saves the case.  Once the reviewer saves a Review or Journal Entry, it is a permanent entry in the case;  the entries cannot be changed or altered.  A reviewer may add an addendum to the Journal Entry to clarify a previous one, but the reviewer must be specific (*e.g.*, "disregard above note by [User]").

156.    When the Clinical Reviewer nurse is finished with the "Review" of the case, if the case had met the Nursing Criteria, the pathway would lead the Clinical Reviewer to "Approve" the case.  If, however, the case did not meet Nursing Criteria, the pathway would lead the Clinical Reviewer to place the case in "O" status, meaning the case was being sent "Out for doctor review" and would be placed in the Medical Director ("doctor") queue.

157.    If a Clinical Reviewer nurse sends a case to the doctor queue, then he/she is required to make an additional Journal Entry stating the "Reason to review," *i.e.*, the reason why the case could not be approved by the Clinical Reviewer and needs to be reviewed by a Medical Director (as well as additional clinical information obtained, if any).  For example, "Reason to review: failed to meet conservative treatment."

158.    When a Medical Director gets a case with the "O" status, he/she does not use the Nursing Criteria "Review" icon, because the Medical Director criteria are broader than the Clinical Reviewer Nursing Criteria.  The Medical Director criteria are in written format and are not linked electronically to the case under review by a Medical Director via the Database, as the Clinical Reviewer criteria are when a case is under review by a Clinical Reviewer nurse.

159.    Rather than following the Nursing Criteria/Pathway in deciding whether or not to approve a case that has been placed in the doctor queue (an "O" status case), a Medical Director simply makes an additional Journal Entry to provide the rationale for approving or denying a case.

160.    Just as Medical Directors provide their rationale for approving or denying a case when appropriately handling a case in the doctor queue, Clinical Reviewers, when working in the doctor queue and Padding cases, also make brief Journal Entries – for example, "back pain X 3 weeks-certify."

161.    By definition, after an "O" is entered into the "Case Status" field, the case is "Out for doctor review," and the next entry in the "Journal Entry," "Comments," and "Case Status" fields ***should be made only by a Medical Director***.  The UserID and Comments fields should clearly reflect that any entry made immediately after an "O" Case Status was made by a doctor, with the "M.D." or "D.O." designation after his/her name.

162.        When a case is Padded, however, the next entry after an "O" Case Status will be from a Clinical Reviewer – either an R.N. or an L.P.N. – who accesses the doctor queue and changes the Case Status from "O" to A."   The Comment and UserID fields will reflect that a nurse approved the case (as opposed to a Medical Director) and "manually changed the status to 'A,'" as the screen shots below taken from CareCore's Pre-Authorization Database demonstrate:





1. Clinical Reviewer/nurse "LPN" places case in doctor queue ("O") at 1:51:13 pm.

2. A different Clinical Reviewer/nurse "LPN" goes into the doctor queue, makes a journal entry, and then Pads the case for approval at 4:12:14 pm.

163.    As the screen shots in the previous paragraph demonstrate, Radiology Management Case Nbr 1027983976 was for a Medicare patient-beneficiary (United Healthcare, "UHC") whose doctor ordered a Myocardial Perfusion Imaging (MPI) Stress Test ("MPI Spect Rest/Stress"), CPT code 78452, on May 25, 2011.  The case had been placed into the doctor queue by a Clinical Reviewer/nurse, R. Satterthwaite, L.P.N., who "manually changed the status to 'O'" because the case "[d]id not meet any of the indications for the study [-] No current clinical on fax, most recent information from 2007 known CAD."  Nevertheless, on May 27, 2011, as the case was running up against the two-day window in which to process the request, the case was approved by L. Aldape, L.P.N., and the comments noted that he/she "manually changed the status to A."  This case was fraudulently Padded because (a) there was no indication from the information provided that the patient actually needed the testing to be done (thus, the

case was placed in the doctor queue), and (b) the case was never reviewed by a doctor, but only by nurses.  Accordingly, the testing was not medically reasonable or necessary.  The second nurse simply wrote in the Journal Entry for this Padded case, "CAD-certify."  *See infra* paragraphs 195 *et seq.* (describing how nurses were trained on "How to Journal for Padding").

164.    Perhaps the most egregious example in which it was clear that a Clinical Reviewer was simply auto-approving a pre-authorization request that would never have been approved absent the Padding Scheme, occurred on July 8, 2011.  Attached as Exhibit B to this Amended Complaint are the screen shots for CareCore's Pre-Authorization Database for this pre-authorization request.  On that day, Radiology Management Case Nbr 1028733572 was initated at 12:32 PM for a Medicaid patient-beneficiary (Affinity, New York), whose doctor ordered a Myocardial Perfusion Imaging (MPI) Stress Test ("MPI Spect Rest/Stress"), CPT code 78452.  Upon changing the priority status from Regular "R" to Urgent "U," *see* Exhibit B at p. 5, the initial Clinical Reviewer/nurse, A. Tyler, R.N., placed the case in the doctor queue ("O") at 12:42:18 PM.  At 12:52:10 PM, a *different* Clinical Reviewer/nurse, C. Wilkins, R.N., went into the doctor queue and Padded the case for approval.  *Id.*  She typed in the Journal Entry as follows:  "complains of chest pain for 2 weeks w/ SOB [shortness of breath] sometimes certify." *Id*. at p. 3.  Just three seconds later, a Medical Director/physician, M. Cyrus, M.D., who was also in the doctor queue and reviewing the same case at the same time, changed the Padded approval ("A") to deny ("D") the request.  *Id*. at p. 5.  Dr. Cyrus wrote as follows in the Journal Entry:

> NON-CERTIFICATION REASON:  Information received by telephone was reviewed.  The history is chest pain.  The description of the pain indicates that there is a low to intermediate risk of heart problems.  The member can exercise.  This test might be needed if the member could not exercise on a treadmill enough to raise his heart rate.  Another reason this test might be needed is an electrocardiogram (EKG or tracing of heart activity) (recording of heart function) that had a finding prevents a routine exercise stress test (walking on a treadmill while recording an electrocardiogram (EKG or tracing of heart activity)) to be

unreliable or if the exercise stress test was abnormal.  This test might also be needed if the member was taking a heart medicine called Digoxin.

*Id*. at pp. 1-2.

165.    Although the example case cited in the preceding paragraph was one which ultimately was reviewed by a Medical Director physician and processed correctly, this example shows CareCore's intent in implementing the Padding Scheme – to auto-approve as many pre-authorization requests and reduce the doctor queue as quickly as possible without regard as to whether or not a proper determination of medical reasonableness and necessity had been made by a Medical Director/physician, in order to avoid the exorbitant fines for each request untimely processed.  In addition, this example further shows that had the proper procedures been followed, many of the Padded cases would not have been approved nor ultimately paid for by insurance plans, including Medicare and Medicaid.

166.    Indeed, CareCore tried to be sure to Pad any and all cases in the doctor queue that were running up against the two-day or three-hour time limit in which to process the pre-authorization request so that CareCore could avoid the $3,000 fine per case for failure to process within the turn-around time.

167.    On one occasion, Relator was advised by his supervisor, Sarah Arthur, that CareCore was required to pay $300,000 for 100 cases that had been left in the doctor queue and had exceeded the two-day turnaround time without being processed.

168.    Relator is also aware that on more than one occasion the night Clinical Supervisor, Tia Keeton, was verbally reprimanded for cases being left in the doctor queue at the end of her shift, which cases exceeded the two-day turnaround time, *i.e*., she was reprimanded for failing to Pad those cases before the turn-around time was exceeded.

### 4.      The Padding PowerPoint Presentation

169.    When Relator was first hired by CareCore as a Clinical Reviewer in January 2005, the Padding Scheme was already in place.

170.    Relator was initially instructed by Bambi Brimmer, former Manager of Clinical Services, on how to Pad.

171.    Over the course of Relator's tenure at CareCore, the company grew by increasing the number of client insurance carriers, in addition to Defendant Insurers, thus, taking on the obligation to make pre-authorization determinations for an increasing number of covered lives.

172.    CareCore, however, did not make the commensurate increases in its staff of Medical Directors and Clinical Reviewers.

173.    Instead, rather than hire more Medical Director physicians to handle the ever-increasing number of the pre-authorization cases in the doctor queue, CareCore simply trained its Clinical Reviewers on the Padding process.

174.    A PowerPoint Presentation was given to the Clinical Reviewers and their Clinical Supervisors, including Relator, in April 2011.   Attached as Exhibit C-1 to this Amended Complaint is the Padding PowerPoint, dated April 2011.

175.    The PowerPoint was created and presented by the Manager of Radiology Clinical Operations, Sarah Arthur.

176.    Although Relator had been instructed on how to Pad cases years earlier, the instructions provided in the PowerPoint presentation remained essentially the same and were formalized in writing.

177.    In connection with the Padding Scheme, CareCore management would review the doctor queues each morning.   If the queue volume was high (which it invariably was), then Padding would be initiated.

178.   The Padding Scheme was designed to be implemented in successive levels, consisting of six levels – Levels 1 through 6.

179.   The Levels address the type of insurance plan, Non-Risk or Risk, and the type of diagnostic study ordered by the treating physician.

180.   "Non-Risk" Plan cases were Padded first.

181.   Based upon the Padding Scheme and the Level structure created by CareCore within the Padding Scheme, it appears that under a Non-Risk Plan, CareCore is not at risk and the insurance carrier administering the plan bears the full cost in providing diagnostic services to its members while paying CareCore to manage utilization and quality for the payer.  Under this type of arrangement, CareCore acts an administrative services organization.

182.   The Non-Risk Plans with which CareCore contracts include:  Affinity, GHI, HealthFirst, HealthPlus, HMO-Select GHI, NHP (Neighborhood Health Partnership, Inc.), PHP (Physicians Health Plan of Northern Indiana, Inc.), Rocky Mountain, United–NJ, and Universal American. *See* Exhibit C-1, at CCN-REL0000721.

183.   "Risk Plans" were not Padded until Level 5.

184.   Based upon the Padding Scheme and the Level structure created by CareCore within the Padding Scheme, it appears that under a Risk Plan, CareCore assumes the insurance carrier's risk for non-emergency patient diagnostic imaging services.  CareCore's risk contracts require the insurance carrier to pay CareCore a fixed amount per member, per month to cover outpatient diagnostic imaging services for the carrier's subscribers.  In exchange, CareCore helps the insurance carrier assemble radiology provider networks and manages benefits through quality assurance programs.

185.    The Risk Plans with which CareCore contracts include:  Aetna NY, Aetna NJ Commercial, Americhoice, Avmed, BCBS Alabama, Coventry, HIP, Horizon, Oxford, United Healthcare ("UHC") Medicare, and WellCare.  *See* Exhibit C-1, at CCN-REL0000725.

186.    When the patient is a beneficiary of a government-funded plan, however, whether the plan is "Non-Risk" or "Risk" – *i.e.*, whether CareCore's contracted plan is "Non-Risk" or "Risk," the fraudulent Padding Scheme results in overutilization and causes false claims to be submitted for diagnostic tests and procedures that are not medically reasonable or necessary, and thus are not qualified for reimbursement.  Insofar as the government or State contracts with the insurance carrier on a capitated, per member per month basis, CareCore's Padding Scheme results ultimately into higher costs to the government as they will have to pay higher capitated rates to its insurance carrier contractors year after year because the rates are being artificially inflated due to beneficiaries receiving, and their health plans paying for, diagnostic services that are not medically reasonable or necessary.

187.    At Level 1, Clinical Reviewers are to Pad single CTs and nuclear medicine studies (excluding MPIs), *e.g.*, kidney scans, bone scans, or thyroid imaging for all Non-Risk Plans:



188.    Level 2 consists of Padding Level 1 cases and, for Non-Risk Plans, also Padding

Multiple CTs (including CTs of the abdomen and pelvis), and for all Plans (Non-Risk and Risk)

Padding Obstetric studies, *i.e.,* obstetric ultrasounds, except those for Wellcare and Coventry

Plan beneficiaries:

### Level 2

- Auto Approve level 1 as well as the following for Non-Risk Plans:
- Multiple CTs
- OB All plans (except Wellcare and Coventry)
- CT abd/pelvis should be padded here. Not in level 1!

189.    Level 3 includes Padding Level 1 and Level 2 cases, plus, for Non-Risk Plans,

also Padding the following:  MRIs without contrast for the brain, upper extremities, and lower

extremities:



190.    Level 4 consists of Padding Level 1, 2 and 3 cases, plus for Non-Risk Plans, also

Padding the following:  MRIs without contrast for joints and spines, MPIs and all MRIs of the

abdomen, pelvis and/or chest (even if with contrast):



191.    Level 5 consists of Padding Level 1, 2, 3 and 4 cases, plus for Risk Plans, also Padding for all CPT codes in Levels 1 through 4.  Basically, Level 5 consists of Padding *all* cases for the CPT codes in Levels 1 through 4 (Non-Risk and Risk Plans).



192.    Level 6 consists of Padding all studies and it was to be performed only by the nightshift and only if it were necessary.  At Level 6, everything, even the very expensive PET scans, are Padded.



193.   Although Level 6 Padding was only to be reached "if needed," Level 6 was reached on most days.

194.   Clinical Reviewers were trained, as set forth in the PowerPoint presentation, on how to journal for Padding, as well as how to conceal the fact that a case had been Padded.

195.   The language to use in the Journal Entry for a Padded case was specifically spelled out for the Clinical Reviewers and was reduced to writing in the PowerPoint presentation.  The Clinical Reviewer was to enter a list of the pertinent signs and symptoms with duration for the particular CPT code for the study requested and then they were to state "— certify."  For example:  "abdominal pain times 3 weeks – certify":

**How to journal for padding:**

- Place the pertinent signs and symptoms with the duration (if noted) and then –certify
- For example: abdominal pain times 3 weeks- certify.
- Do not document anything in the journal about padding!

196.   Not only did CareCore train its Clinical Reviewers on what to state in their Journal Entries when Padding a case, CareCore also instructed its Clinical Reviewers to not write down anything in the journal about Padding as evidenced in the slide above:  "Do not document anything in the journal about padding!"

197.   CareCore directed its employees to Pad cases on a daily basis, despite marketing itself as an evidence-based utilization management company.

198.    Each day, management at CareCore would advise the Clinical Supervisors, sometimes via instant message ("IM") and sometimes via email, when to begin Padding and at which level they should begin.

199.    Specifically, if the instruction was to begin at Level 3, the Clinical Reviewers would Pad all cases in the doctor queue in Levels 1, 2, and 3.

200.    If Clinical Reviewers were really behind – *i.e.*, there was an increased risk that CareCore would miss the turn-around time for many cases on a given day and be subject to fines – then, the Clinical Supervisors were also expected to Pad cases.  Sometimes, even Sarah Arthur, Manager of Radiology Clinical Operations, would Pad.

201.    Indeed, in the last two years of Relator's employment, when Relator reported to work at 10:00AM EST, they often were already Padding at Level 5.

### 5.    CareCore Incentivized Clinical Reviewers To Pad Cases

202.    Each Clinical Reviewer (and Supervisor, when they were also required to Pad) was, and is required to keep track of and report to his/her Clinical Supervisor the number of cases Padded by insurance plan on a daily basis.

203.    Each Clinical Supervisor then compiles the data in a report, which is provided to the Clinical Vice President, Lynette Becks, and the CEO, Don Ryan (until his death in September 2011) and thereafter to acting CEO, Doug Tardio, followed by current CEO, John Arlotta (as of June 2012).

204.    The plan and purpose of the Padding Scheme was to prevent CareCore from being fined $3,000 per case for those cases for which CareCore would have been unable, but for the Padding Scheme, to meet the turn-around times dictated by its contracts with the Defendant Insurers.

205.    The CEOs insisted upon daily Padding reports so that they could appreciate the amount of money the Padding Scheme was saving CareCore.

206.    CareCore monetarily incentivized their Clinical Reviewers to Pad (and perhaps also to discourage them from reporting this fraudulent conduct).

207.    Clinical Reviewers are paid $20/hour.  However, once they meet the threshold of processing 70 cases, they are paid by the case at $2.54/case.  Thus, for a typical eight-hour day, a Clinical Reviewer would be paid $160.  But, if he/she were able to Pad 100 cases, after the initial 70 cases were reviewed and processed (some of which also might be Padded cases), he/she would earn an additional $254 for that day.  It was not unusual for the Clinical Reviewers to Pad 100 cases in a single day.

208.    In April of 2012, however, CareCore management trained many more Clinical Reviewers on Padding and began limiting each Reviewer to Padding only 50 cases each day.

209.    Thereafter, management sometimes instituted daily caps of 20 or 30 Pads per Clinical Reviewer, but, if later in the day, the doctor queue grew to contain too many cases, management would simply waive the cap.

210.    In an Instant Message ("IM") conversation that took place in June 2012 among the Clinical Supervisors, they discussed the fact that Janet Coughlin, who was Sarah Arthur's successor as Radiology Clinical Operations Manager, wanted them to use a word other than "Padding" in their IM exchanges to describe their "auto-approval" scheme.  *See* IM conversation at Exhibit C-2 to this Amended Complaint.  The Clinical Supervisors joked that instead of the word "Padding," they might use words like "kachinging,"  "Code Green because that's what they make when they pad," "the Secret Club," or simply "money."  *See id.*

C.     The Defendant Insurers Were Reckless In Their Audit Function

211.     CareCore had internal auditors and certain insurance carriers also conducted periodic audits.

212.     For the most part, the insurance carrier audits consisted of listening to the Clinical Reviewers handle calls on the Avaya system.

213.     However, that is not the point at which the cases were Padded.  The cases were not Padded until after they were sent to the doctor queue and were approaching expiration of the turn-around time without having been reviewed by a Medical Director.

214.     If one compares a Journal Entry for a Padded case with a Journal Entry for a case that was properly handled in the doctor queue by a Medical Director, it becomes obvious which cases are Padded.

215.     For example, in Exhibit A, Patient 98 for Radiology Management Case Nbr 1027963485 was approved for CT scan of the abdomen without and with contrast.  This case was reviewed by a Medical Director physician as indicated by the "MD" and was "certified" as medically reasonable and necessary because the Medicare patient-beneficiary presented "with a history of breast cancer and a malignant pleural effusion; CT of the chest already approved."

216.     Compare Patient 98 with Patient 106 for Radiology Management Case Nbr 1028180660, which was also approved for CT scan of the abdomen without and with contrast.  This case, however, was "reviewed" by a Clinical Reviewer nurse as indicated by the "LPN" and was certified on the sole basis that the patient presented with "[a]bdominal pain."  In Padding this case, the Clinical Reviewer nurse followed the instructions right out of the PowerPoint presentation and used a pre-set Journal Entry as described in paragraph 195 above.  Just as the PowerPoint slide instructs Clinical Reviewers to "Place the pertinent signs and symptoms with

the duration (if noted) and then –certify" so too did the Clinical Reviewer nurse Padding this case enter "Abdominal pain-certify."

217.     Thus, not only would a cursory review of the Comments, Case Status and UserID fields in CareCore's Pre-Authorization Database have revealed Padding, as discussed *supra*, but, a review of the Journal Entries in CareCore's database also would have revealed the Padding Scheme, if the Defendant Insurers had conducted proper audits.

218.     Another telltale sign that a case was Padded is the timing and frequency in which cases were approved and removed from the doctor queue.   Attached as Exhibit D to this Amended Complaint is a chart derived from Exhibit A, which lists certain case summaries for two individual Clinical Reviewers.   Exhibit D demonstrates that four Medicare cases were reviewed by Aldape, L.P.N. on June 9, 2011, and were all Padded within a span of five minutes. The journal entries all follow the format of recording the "pertinent signs and symptoms with the duration (if noted) and then –certify."  *See* Exhibit C-1.

219.     A similar pattern is seen for at least 14 cases reviewed and Padded by Chase, LPN during the evening shift on July 7, 2011 – the 14 cases were "approved" within two hours.  *See* Exhibit D.

220.     These cases listed on Exhibit D are only representative examples based on Relator's experience and knowledge of the Padding Scheme.   These two Clinical Reviewers, Aldape and Chase, and many others working from home, likely churned Padded cases every two to three minutes.

221.     The examples set forth in paragraphs 218 and 219 above, and Exhibit D, demonstrate not only that nurses were improperly approving cases that were reserved for a Medical Director to determine whether the ordered test or procedure was medically reasonable

and necessary, it also demonstrates the way in which CareCore incentivizes its Clinical Reviewers to Pad cases in order to remove them from of the doctor queue lest the company be subject to exorbitant fines.

222.    Thus, had the Defendant Insurers properly audited CareCore's files, it would have been obvious that cases were being Padded.

223.    Accordingly, the Defendant Insurers allowed the Padding Scheme to be implemented and to be perpetuated by failing properly to conduct audits of CareCore's program.

**D.    CareCore's Fraudulent Padding Scheme and the Defendant Insurers' Reckless Conduct Caused the Submission of False Claims and Loss to the Federal and State Treasuries**

224.    As described in paragraph 134 above, CareCore processes approximately 15,000 to 20,000 cases per day – 5,000 to 10,000 originate via telephone requests and the remaining originate from the website and facsimile requests.  Based on Relator's experience and knowledge of the Padding Scheme, approximately 30% to 40% of the cases received via telephone for pre-authorization by CareCore are placed into the doctor queue.  Additionally, 60% to 70% of the website and written (faxed) cases are placed in the doctor queue.  Accordingly, between 1,500 and 4,000 cases per day are placed in the doctor queue from the telephone requests, and an additional 6,000 to 7,000 cases per day are placed in the doctor queue from the website and facsimile requests.  Thus, between 7,500 and 11,000 cases are placed in the doctor queue on a daily basis, each requiring a Medical Director physician's determination of medical reasonableness and necessity.  Assuming all 50 Medical Directors work every day (which was almost never the case), each would have to make determinations on approximately 150 to 220 cases each day – a seemingly impossible feat.

225.    Approximately 30% to 40% of the cases submitted to CareCore for pre-authorization are for Medicare or Medicaid patients.

226.    For cases that are placed in the doctor queue for review, and actually reviewed by a CareCore Medical Director, based upon Relator's experience, 60% to 70% of those cases are denied and thus, the diagnostic services ordered by the treating physicians are deemed to be not medically reasonable and necessary.

227.    Nevertheless, as a result of the Padding Scheme, a significant number of the cases that are placed in the doctor queue were and continue to be Padded and approved.  Based upon his experience, Relator estimates that at least an average of 1,000 cases per day were Padded. This is a conservative estimate because on many days up to 2,000 cases were Padded.

228.    Once a case has been approved by CareCore, the patient undergoes the diagnostic service at the facility, the facility submits the bill to the payor, and the payor pays for the service. In the case of government beneficiaries, the government programs ultimately pay for the diagnostic services.

229.    The only circumstances under which the approved diagnostic services are not reimbursed would be if the diagnostic test were performed prior to approval, or if the patient never underwent the test or procedure.  Accordingly, the vast majority of diagnostic services that resulted from CareCore's Padding Scheme were approved for payment, performed, and reimbursed, despite the fact that none of the Padded cases had been properly qualified as medically reasonable and necessary, as is required for government reimbursement.

230.    As a result of CareCore's Padding Scheme and the Defendant Insurers' utter failure to carry out their auditing functions, government healthcare programs spent millions, if not billions of dollars, paying for and/or reimbursing for diagnostic services that were not medically reasonable or necessary.

231.   By virtue of the false or fraudulent claims that Defendants knowingly caused to be presented, the United States and the *Qui Tam* States have suffered actual damages and are entitled to recover treble damages plus a civil monetary penalty for each false claim.

232.   As a result of Defendants' fraudulent conduct, the government healthcare programs have been paying and continue to pay as much as $840,000 daily for diagnostic services which were and are not medically reasonable and necessary.

### COUNT I
### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

### United States of America ex rel. John Miller vs. CareCore National, Inc.

233.   Relator incorporates herein by reference each and every allegation of the preceding paragraphs of this Amended Complaint as though fully set forth herein.

234.   As a result of the foregoing conduct, CareCore knowingly presented, or caused to be presented, false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(1)(A).[2]

235.   The claims relevant to this Count include all claims submitted since at least February 2007 to the present for reimbursement of diagnostic services ordered by treating physicians for Medicare and Medicaid beneficiaries that were not medically reasonable or necessary, which were caused to be submitted by virtue of CareCore's Padding Scheme through carrier contractors, including through the Defendant Insurers, which in turn, contracted, directly or indirectly, with Medicare and/or state Medicaid agencies.

---

[2] The False Claims Act was amended by Congress as part of the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21 (May 20, 2009) (the "FERA amendments"), and again as part of the Patient Protection and Affordable Care Act, Pub.L. 111-148 (March 23, 2010).   The FERA amendments modified and renumbered the subsections of § 3729(a).   The amendments made to section 3729(a)(1) (now numbered 3729(a)(1)(A)) are not retroactive, and therefore the 1986 version of the False Claims Act applies to Defendants' conduct prior to May 20, 2009.

236.    CareCore caused the submission of such false claims through their client carrier contractors, including the Defendant Insurers, knowing that those private entities were agents for the federal and/or state governments, that the Padded pre-authorization requests would be submitted by the carrier contractors, including the Defendant Insurers, to Medicare and/or state Medicaid agencies, and that for each and every Padded pre-authorization request, the federal and/or state government would base its payments to carrier contractors, including the Defendant Insurers, on those Padded pre-authorization requests.

237.    All such claims CareCore caused to be submitted were false because the Padded pre-authorization approvals were for diagnostic services that were not properly qualified as medically reasonable or necessary.

238.    CareCore had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity because, in its role as utilization review manager for its insurer clients it had actual and constructive knowledge of the medical information of the beneficiaries required to make the determination as to whether or not the diagnostic services ordered were medically reasonable and necessary, and because, as utilization review manager for its insurer clients, including for the Defendant Insurers, CareCore was obligated by contract as well as under federal and state regulations to ensure such diagnostic services so ordered were medically reasonable and necessary.

239.    As a result of CareCore's actions as set forth above in this Amended Complaint, the United States of America has been, and continues to be, severely damaged.

**COUNT II**
**(Violation of Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B))**

**United States of America ex rel. John Miller vs. CareCore National, Inc.**

240.    Relator incorporates herein by reference each and every allegation of the preceding paragraphs of this Amended Complaint as though fully set forth herein.

241.    As a result of the foregoing conduct, CareCore knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).[3]

242.    The claims relevant to this Count include all claims submitted since at least February 2007 to the present for reimbursement of diagnostic services ordered by treating physicians for Medicare and Medicaid beneficiaries that were not medically reasonable or necessary, which were caused to be submitted by virtue of CareCore's Padding Scheme through carrier contractors, including through the Defendant Insurers, which in turn, contracted, directly or indirectly, with Medicare and/or state Medicaid agencies.

243.    The false or fraudulent records or statements underlying the false claims relevant to this Count include all false or fraudulent records or statements regarding the medical reasonableness and necessity of diagnostic services ordered by treating physicians for Medicare and Medicaid beneficiaries made by CareCore to its client carrier contractors, including the Defendant Insurers, in carrying out its Padding Scheme.

244.    CareCore made false or fraudulent records or statements underlying the false claims to its client carrier contractors, including the Defendant Insurers, knowing that the Padded

---

[3] The FERA amendments to subsection 3729(a)(2) (now numbered 3729(a)(1)(B)) are expressly made applicable to claims pending as of June 7, 2008.  *See* Pub. L. 111-21, Sec. 4(f)(1) (stating this change should be deemed to "take effect as if enacted on June 7, 2008" and should "apply to all claims under the False Claims Act (31 U.S.C. 3729 *et seq.*) that are pending on or after that date").

pre-authorization approvals were reviewed only by CareCore personnel who were not qualified to make an appropriate determination that the ordered tests or procedures were medically reasonable and necessary, that its client carrier contractors were private entities acting as agents for the federal and/or state governments, and that the Padded pre-authorization requests would be material to the payment decisions of these carrier contractors, who in turn, paid for all such resulting claims out of the federal and/or state funds.

245.   All such resulting claims CareCore caused to be submitted were false because the Padded pre-authorization approvals were for diagnostic services that were not properly qualified as medically reasonable or necessary.

246.   CareCore had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity because, in its role as utilization review manager for its insurer clients, it had actual and constructive knowledge of the medical information of the beneficiaries required to make the determination as to whether or not the diagnostic services ordered were medically reasonable or necessary, and because as utilization review manager for its insurer clients, including for the Defendant Insurers, CareCore was obligated by contract as well as under federal and state regulations to ensure such diagnostic services so ordered were medically reasonable and necessary.

247.   The United States of America, unaware of the falsity of the records or statements underlying the false claims caused to be made by CareCore, and in reliance on the accuracy of these records or statements underlying the false claims, paid and may still be paying or reimbursing for diagnostic services which were and are not medically reasonable and necessary.

248.   As a result of CareCore's actions as set forth above in this Amended Complaint, the United States of America has been, and continues to be, severely damaged.

**COUNT III**

**Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**

**United States of America ex rel. John Miller vs. the Defendant Insurers**

249.  Relator incorporates herein by reference each and every allegation of the preceding paragraphs of this Amended Complaint as though fully set forth herein.

250.  As a result of the foregoing conduct, the Defendant Insurers knowingly presented, or caused to be presented, false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(1)(A).[4]

251.  The claims relevant to this Count include all claims submitted by the Defendant Insurers from at least February 2007 to the present for reimbursement of diagnostic services ordered by treating physicians for Medicare and/or Medicaid beneficiaries that were auto-approved as a result of CareCore's Padding Scheme.

252.  The claims relevant to this Count were for reimbursement of diagnostic services that were not properly qualified as medically reasonable or necessary, and were thus not reimbursable.

253.  Had the Defendant Insurers conducted proper audits of CareCore's pre-authorization approvals, they would have uncovered CareCore's Padding Scheme by recognizing that the auto-approved (*i.e.*, Padded) requests as described herein were reviewed only by CareCore personnel who were not qualified to make the appropriate determinations that the ordered tests or procedures were medically reasonable and necessary.  Accordingly, the

---

[4] The False Claims Act was amended by Congress as part of the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21 (May 20, 2009) (the "FERA amendments"), and again as part of the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010).  The FERA amendments modified and renumbered the subsections of § 3729(a).  The amendments made to section 3729(a)(1) (now numbered 3729(a)(1)(A)) are not retroactive, and therefore the 1986 version of the False Claims Act applies to Defendants' conduct prior to May 20, 2009.

Defendant Insurers were reckless in their performance as carrier contractors under Medicare and/or state Medicaid programs.

254.    As a result of these Defendant Insurers' actions as set forth above in this Amended Complaint, the United States of America has been, and continues to be, severely damaged.

**COUNT IV**
**Violation of Colorado Medicaid False Claims Act**

**State of Colorado ex rel. John Miller vs. CareCore and RMHP**

255.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.

256.    This is a civil action brought by Relator on behalf of the State of Colorado against Defendants, CareCore and RMHP, under the Colorado Medicaid False Claims Act, COLO. REV. STAT. ANN. § 25.5-4-306(2).

257.    The State of Colorado and/or one of its agents contracted, directly or indirectly, with RMHP in connection with the administration of Medicaid claims and claims under CHP and/or FHP in Colorado, including claims related to outpatient diagnostic services.

258.    RMHP, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

259.    Defendants, CareCore and RMHP, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval to officers or employees of the state, in violation of COLO.. REV. STAT. ANN. § 25.5-4-305(1)(a).

260.    Defendants, CareCore and RMHP, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of COLO. REV. STAT. ANN. § 25.5-4-305(1)(b).

261.    Defendants, CareCore and RMHP, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money or property to the state in connection with Colorado Medical Assistance Act, or knowingly concealed or knowingly and improperly avoided or decreased, and may still be knowingly concealing or knowingly and improperly avoiding or decreasing obligations to  pay or transmit money to the State of Colorado in connection with Colorado Medical Assistance Act, in violation of COLO. REV. STAT. ANN. § 25.5-4-305(1)(f).

262.    The State of Colorado, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and RMHP, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

263.    As a result of Defendants' actions, as set forth above, the State of Colorado and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT V**
**Violation of Florida False Claims Act**

**State of Florida vs. CareCore and Wellcare**

264.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.

265.    This is a civil action brought by Relator on behalf of the State of Florida against Defendants, CareCore and Wellcare, under the State of Florida's False Claims Act, FLA. STAT. ANN. § 68.083(2).

266.    The State of Florida and/or one of its agents contracted, directly or indirectly, with Wellcare in connection with the administration of Medicaid claims and claims under CHP and/or FHP in Florida, including claims related to outpatient diagnostic services.

267.    Wellcare, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

268.    Defendants, CareCore and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Florida or one of its agencies false or fraudulent claims for payment or approval, in violation of FLA. STAT. ANN. § 68.082(2)(a).

269.    Defendants, CareCore and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims

- 83 -

paid or approved by the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082(2)(b).

270.    Defendants, CareCore and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082 (2)(g).

271.    The State of Florida and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and Wellcare, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

272.    As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT VI
### Violation of Georgia Medicaid False Claims Act

### State of Georgia vs. CareCore and Wellcare

273.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.

274.    This is a civil action brought by Relator, in the name of the State of Georgia, against Defendants, CareCore and Wellcare, pursuant to the State of Georgia Medicaid Fraud False Claims Act, GA. CODE ANN. § 49-4-168.2(b).

275.    The State of Georgia and/or one of its agents contracted, directly or indirectly, with Wellcare in connection with the administration of Medicaid claims and claims under CHP and/or FHP in Georgia, including claims related to outpatient diagnostic services.

276.    Wellcare, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

277.    Defendants, CareCore and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of GA. CODE ANN. § 49-4-168.1(a)(1).

278.    Defendants, CareCore and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of GA. CODE ANN. § 49-4-168.1(a)(2).

279.    Defendants, CareCore and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit property or money to the Georgia Medicaid program or knowingly and improperly avoided or decreased an obligation to pay or transmit property or money to the Georgia Medicaid program, and may be continuing to knowingly and improperly avoid or decrease an obligation to

pay or transmit property or money to the Georgia Medicaid program, in violation of GA. CODE ANN. § 49-4-168.1(a)(7).

280. The State of Georgia and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and Wellcare, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

281. As a result of Defendants' actions, as set forth above, the State of Georgia and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

<u>COUNT VII</u>
**Violation of Illinois False Claims Act**

**State of Illinois vs. CareCore and Wellcare**

282. Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.

283. This is a civil action brought by Relator on behalf of the State of Illinois against Defendants, CareCore and Wellcare, under the Illinois False Claims Act, 740 ILL. COMP. STAT. ANN. 175/4(b).

284. The State of Illinois and/or one of its agents contracted, directly or indirectly, with Wellcare in connection with the administration of Medicaid claims and claims under CHP and/or FHP in Illinois, including claims related to outpatient diagnostic services.

285. Wellcare, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

286. Defendants, CareCore and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the

information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(1)(A).

287.    Defendants, CareCore and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(1)(B).

288.    Defendants, CareCore and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state or knowingly concealed or knowingly and improperly avoided or decreased or may still be knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(1)(G).

289.    The State of Illinois and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and Wellcare, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

290.    As a result of Defendants' actions, as set forth above, the State of Illinois and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

<u>COUNT VIII</u>

**Violation of the Maryland False Health Claims Act of 2010**

**State of Maryland vs. CareCore, Americhoice MD, and UHC**

291.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.

292.    This is a civil action brought by Relator on behalf of the State of Maryland against Defendants, CareCore, Americhoice MD, and UHC, under the Maryland False Health Claims Act of 2010, MD. CODE ANN., HEALTH-GEN. § 2-604.

293.    The State of Maryland and/or one of its agents contracted, directly or indirectly, with Americhoice MD and/or UHC in connection with the administration of Medicaid claims and claims under CHP and/or FHP in Maryland, including claims related to outpatient diagnostic services.

294.    Americhoice MD and/or UHC, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

295.    Defendants, CareCore, Americhoice MD, and UHC, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of MD. CODE ANN., Health-Gen. § 2-602(a)(1).

296.    Defendants, CareCore, Americhoice MD, and UHC, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of MD. CODE ANN., Health-Gen. § 2-602(a)(2).

297.    Defendants, CareCore, Americhoice MD, and UHC, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements false records or statements material to obligations to pay or transmit money or property to the state, in violation of MD. CODE ANN., Health-Gen. § 2-602(a)(7).

298.    The State of Maryland, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore, Americhoice MD, and UHC, and in reliance on the accuracy of these claims and/or statements, paid for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

299.    As a result of Defendants' actions, as set forth above, the State of Maryland and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT IX**
**Violation of the Michigan Medicaid False Claims Act**

**State of Michigan vs. CareCore, Coventry, and HealthPlus –MI**

300.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.

301.    This is a civil action brought by Relator in the name of the State of Michigan against Defendants, CareCore, Coventry, and HealthPlus –MI, under the Michigan Medicaid False Claims Act, MICH. COMP. LAWS ANN. § 400.610a(l).

302.    The State of Michigan and/or one of its agents contracted, directly or indirectly, with Coventry in connection with the administration of Medicaid claims and claims under CHP and/or FHP in Michigan, including claims related to outpatient diagnostic services.

303.    Coventry, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

304.    The State of Michigan and/or one of its agents contracted, directly or indirectly, with HealthPlus –MI in connection with the administration of Medicaid claims and claims under CHP and/or FHP in Michigan, including claims related to outpatient diagnostic services.

305.    HealthPlus –MI, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

306.    Defendants, CareCore, Coventry, and HealthPlus –MI, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in applications for Medicaid benefits, in violation of MICH. COMP. LAWS ANN. § 400.603(1).

307.    Defendants, CareCore, Coventry, and HealthPlus –MI, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or cause to be made false statements or false representations of material facts for use in determining rights to Medicaid benefits, in violation of MICH. COMP. LAWS ANN. § 400.603(2).

308.    Defendants, CareCore, Coventry, and HealthPlus– MI, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be

concealing or failing to disclose, events affecting their initial or continued rights to receive Medicaid benefits or the initial or continued rights of any other person on whose behalf Defendants have applied for or are receiving benefits for, with intent to obtain benefits to which Defendants or other persons are not entitled or in an amount greater than that to which Defendants or other persons are entitled, in violation of MICH. COMP. LAWS ANN. § 400.603(3).

309.    Defendants, CareCore, Coventry, and HealthPlus –MI, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or presented or caused to be made or presented, and may still be making or presenting or causing to be made or presented to employees or officers of the State of Michigan, false claims under the social welfare act, Act No. 280 of the Public Acts of 1939, in violation of MICH. COMP. LAWS ANN. § 400.607(1).

310.    Defendants, CareCore, Coventry, and HealthPlus –MI, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or presented or caused to be made or presented, and may still be making or presenting or causing to be made or presented claims under the social welfare act, Act No. 280 of the Public Acts of 1939, that falsely represent that the goods or services for which the claims were made were medically necessary in accordance with professionally accepted standards, in violation of MICH. COMP. LAWS ANN. § 400.607(2).

311.    The State of Michigan, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore, Coventry and HealthPlus –MI, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for

beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

312.    As a result of Defendants' actions, as set forth above, the State of Michigan and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT X
### Violation of New Jersey False Claims Act

### State of New Jersey vs. CareCore and HealthFirst

313.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.

314.    This is a civil action brought by Relator, in the name of the State of New Jersey, against Defendants, CareCore and HealthFirst, pursuant to the State of New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-5(b).

315.    The State of New Jersey and/or one of its agents contracted, directly or indirectly, with HealthFirst in connection with the administration of Medicaid claims and claims under CHP and/or FHP in New Jersey, including claims related to outpatient diagnostic services.

316.    HealthFirst, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

317.    Defendants, CareCore and HealthFirst, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be causing to be presented, to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval under the New Jersey Medicaid program, in violation of N.J. STAT. ANN. § 2A:32C-3(a).

318.    Defendants, CareCore and HealthFirst, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State, in violation of N.J. STAT. ANN. § 2A:32C-3(b).

319.    Defendants, CareCore and HealthFirst, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money or property to the State, in violation of N.J. STAT. ANN. § 2A:32C-3(g).

320.    The State of New Jersey and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and HealthFirst, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

321.    As a result of Defendants' actions, as set forth above, the State of New Jersey and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XI
### Violation of New York False Claims Act

### State of New York vs. CareCore, Affinity, Americhoice NY,
### HealthFirst, HIP, EmblemHealth, UHC, and Wellcare

322.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.

323.    This is a civil action brought by Relator on behalf of the State of New York against Defendants, CareCore, Affinity, Americhoice NY, HealthFirst, HIP, EmblemHealth, UHC, and Wellcare, under the State of New York False Claims Act, N.Y. STATE FIN. LAW § 190(2).

324.    The State of New York and/or one of its agents contracted, directly or indirectly, with Affinity in connection with the administration of Medicaid claims and claims under CHP and/or FHP in New York, including claims related to outpatient diagnostic services.

325.    Affinity, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

326.    The State of New York and/or one of its agents contracted, directly or indirectly, with Americhoice NY and/or UHC in connection with the administration of Medicaid claims and claims under CHP and/or FHP in New York, including claims related to outpatient diagnostic services.

327.    Americhoice NY and/or UHC, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

328.    The State of New York and/or one of its agents contracted, directly or indirectly, with HealthFirst in connection with the administration of Medicaid claims and claims under CHP and/or FHP in New York, including claims related to outpatient diagnostic services.

329.    HealthFirst, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

330.    The State of New York and/or one of its agents contracted, directly or indirectly, with HIP and/or EmblemHealth in connection with the administration of Medicaid claims and claims under CHP and/or FHP in New York, including claims related to outpatient diagnostic services.

331.    HIP and/or EmblemHealth, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

332.    The State of New York and/or one of its agents contracted, directly or indirectly, with Wellcare in connection with the administration of Medicaid claims and claims under CHP and/or FHP in New York, including claims related to outpatient diagnostic services.

333.    Wellcare, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

334.    Defendants, CareCore, Affinity, Americhoice NY, HealthFirst, HIP, EmblemHealth, UHC, and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. STATE FIN. LAW § 189(1)(a).

335.    Defendants, CareCore, Affinity, Americhoice NY, HealthFirst, HIP, EmblemHealth, UHC, and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing

to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. STATE FIN. LAW § 189(1)(b).

336.    Defendants, CareCore, Affinity, Americhoice NY, HealthFirst, HIP, EmblemHealth, UHC, and Wellcare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the State of New York or one of its political subdivisions, in violation of N.Y. STATE FIN. LAW § 189(1)(g).

337.    The State of New York, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore, Affinity, Americhoice NY, HealthFirst, HIP, EmblemHealth, UHC, and Wellcare, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable or necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

338.    As a result of Defendants' actions, as set forth above, the State of New York and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XII
### Violation of Tennessee Medicaid False Claims Act

### State of Tennessee vs. CareCore, Americhoice TN, and UHC

339.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.

340.    This is a civil action brought by Relator in the name of the State of Tennessee against Defendants, CareCore, Americhoice TN and UHC, under the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-183(b).

341.    The State of Tennessee and/or one of its agents contracted, directly or indirectly, with Americhoice TN and/or UHC in connection with the administration of Medicaid claims and claims under CHP and/or FHP in Tennessee, including claims related to outpatient diagnostic services.

342.    Americhoice TN and/or UHC, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services.

343.    Defendants, CareCore, Americhoice TN, and UHC, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(A).

344.    Defendants, CareCore, Americhoice TN, and UHC, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program paid for or approved, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(B).

345.    Defendants, CareCore, Americhoice TN, and UHC, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may

still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program, in violation of TENN. CODE ANN. § 71-5-182(a)(1)(D).

346.    The State of Tennessee, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore, Americhoice TN, and UHC, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

347.    As a result of Defendants' actions, as set forth above, the State of Tennessee and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

<u>**COUNT XIII**</u>
**Violation of California False Claims Act**

**State of California vs. CareCore and the Defendant Insurers**

348.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

349.    This is a civil action brought by Relator in the name of the State of California against Defendants, CareCore and the Defendant Insurers, under the California False Claims Act, CAL. GOV'T CODE § 12652(c)(1).

350.    The State of California and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims

and/or claims under other state-funded plans in California, including claims related to outpatient diagnostic services.

351. Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for California state-funded plan beneficiaries.

352. Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of CAL. GOV'T CODE § 12651(a)(1).

353. Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of CAL. GOV'T CODE § 12651(a)(2).

354. Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or

knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of CAL. GOV'T CODE § 12651(a)(7).

355.    The State of California, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

356.    As a result of Defendants' actions, as set forth above, the State of California and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIV**
**Violation of Connecticut False Claims Act**

**State of Connecticut vs. CareCore and the Defendant Insurers**

357.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

358.    This is a civil action brought by Relator in the name of the State of Connecticut against Defendants, CareCore and the Defendant Insurers, under the Connecticut False Claims Act, CONN. GEN. STAT. § 17b-301d.

359.    The State of Connecticut and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims

and/or claims under other state-funded plans in Connecticut, including claims related to outpatient diagnostic services.

360. Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Connecticut state-funded plan beneficiaries.

361. Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of CONN. GEN. STAT. § 17b-301b(a)(1).

362. Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of CONN. GEN. STAT. § 17b-301(a)(2).

363. Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or

knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of CONN. GEN. STAT. § 17b-301(a)(7).

364.    The State of Connecticut, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

365.    As a result of Defendants' actions, as set forth above, the State of Connecticut and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

<u>**COUNT XV**</u>
**Violation of Delaware False Claims and Reporting Act**

**State of Delaware vs. CareCore and the Defendant Insurers**

366.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

367.    This is a civil action brought by Relator in the name of the State of Delaware against Defendants, CareCore and the Defendant Insurers, under the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1203(b)(1).

368.    The State of Delaware and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims

and/or claims under other state-funded plans in Delaware, including claims related to outpatient diagnostic services.

369.   Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Delaware state-funded plan beneficiaries.

370.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of DEL. CODE ANN. tit. 6, § 1201(a)(1).

371.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of DEL. CODE ANN. tit. 6, § 1201(a)(2).

372.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or

knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of DEL. CODE ANN. tit. 6, § 1201(a)(7).

373.    The State of Delaware, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

374.    As a result of Defendants' actions, as set forth above, the State of Delaware and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVI
### Violation of District of Columbia
### Medicaid Fraud Enforcement and Recovery Amendment Act of 2012

### District of Columbia vs. CareCore and the Defendant Insurers

375.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

376.    This is a civil action brought by Relator in the name of the District of Columbia against Defendants, CareCore and the Defendant Insurers, under the District of Columbia Medicaid Fraud Enforcement and Recovery Amendment Act of 2012,  D.C. CODE ANN. § 2-381.03(b).

377.   The District of Columbia and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other district-funded plans in the District of Columbia, including claims related to outpatient diagnostic services.

378.   Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for District of Columbia-funded plan beneficiaries.

379.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other district-funded programs, in violation of D.C. CODE ANN. § 2-381.02(a)(1).

380.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other district-funded programs paid for or approved, in violation of D.C. CODE ANN. § 2-381.02(a)(2).

381.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may

still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the district, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the district, relative to the Medicaid program and/or other district-funded programs, in violation of D.C. CODE ANN. § 2-381.02(a)(6).

382.    The District of Columbia, and/or its agencies, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the district or its agencies.

383.    As a result of Defendants' actions, as set forth above, the District of Columbia and/or its agencies have been, and may continue to be, severely damaged.

<u>**COUNT XVII**</u>
**Violation of Hawaii False Claims Act**

**State of Hawaii vs. CareCore and the Defendant Insurers**

384.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

385.    This is a civil action brought by Relator in the name of the State of Hawaii against Defendants, CareCore and the Defendant Insurers, under the Hawaii False Claims Act, HAW. REV. STAT. § 661-25.

386.    The State of Hawaii and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims

and/or claims under other state-funded plans in Hawaii, including claims related to outpatient diagnostic services.

387.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Hawaii state-funded plan beneficiaries.

388.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of HAW. REV. STAT. § 661-21(a)(1).

389.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of HAW. REV. STAT. § 661-21(a)(2).

390.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or

knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of HAW. REV. STAT. § 661-21(a)(6).

391.    The State of Hawaii, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

392.    As a result of Defendants' actions, as set forth above, the State of Hawaii and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

<u>COUNT XVIII</u>
**Violation of Indiana False Claims and Whistleblower Protection Act**

**State of Indiana vs. CareCore and the Defendant Insurers**

393.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

394.    This is a civil action brought by Relator in the name of the State of Indiana against Defendants, CareCore and the Defendant Insurers, under the Indiana False Claims and Whistleblower Protection Act,  IND. CODE § 5-11-5.5-4.

395.    The State of Indiana and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Indiana, including claims related to outpatient diagnostic services.

396.   Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Indiana state-funded plan beneficiaries.

397.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of IND. CODE § 5-11-5.5-2(b)(1).

398.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of IND. CODE § 5-11-5.5-2(b)(2).

399.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of IND. CODE § 5-11-5.5-2(b)(6).

400.    The State of Indiana, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

401.    As a result of Defendants' actions, as set forth above, the State of Indiana and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

<u>COUNT XIX</u>
**Violation of Iowa False Claims Act**

**State of Iowa vs. CareCore and the Defendant Insurers**

402.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

403.    This is a civil action brought by Relator in the name of the State of Iowa against Defendants, CareCore and the Defendant Insurers, under the Iowa False Claims Act,  IOWA CODE § 685.3(2).

404.    The State of Iowa and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Iowa, including claims related to outpatient diagnostic services.

405.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Iowa state-funded plan beneficiaries.

- 110 -

406.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of IOWA CODE § 685.2 (1)(a).

407.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of IOWA CODE § 685.2(1)(b).

408.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of IOWA CODE § 685.2(1)(g).

409.    The State of Iowa, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may

continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

410.    As a result of Defendants' actions, as set forth above, the State of Iowa and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XX**
**Violation of Louisiana Medical Assistance Programs Integrity Law**

**State of Louisiana vs. CareCore and the Defendant Insurers**

411.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

412.    This is a civil action brought by Relator in the name of the State of Louisiana against Defendants, CareCore and the Defendant Insurers, under the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. ANN. § 46:439.1(A).

413.    The State of Louisiana and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims in Louisiana, including claims related to outpatient diagnostic services.

414.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Louisiana state-funded plan beneficiaries.

415.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be

presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program, in violation of LA. REV. STAT. ANN. § 46:438.3(A).

416.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program, in violation of LA. REV. STAT. ANN. § 46:438.3(B).

417.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program, in violation of LA. REV. STAT. ANN. § 46:438.3(C).

418.   The State of Louisiana, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

419.    As a result of Defendants' actions, as set forth above, the State of Louisiana and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXI
### Violation of Massachusetts False Claims Act

### Commonwealth of Massachusetts vs. CareCore and the Defendant Insurers

420.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

421.    This is a civil action brought by Relator in the name of the Commonwealth of Massachusetts against Defendants, CareCore and the Defendant Insurers, under the Massachusetts False Claims Act,  MASS. GEN. LAWS ch. 12, § 5C(2).

422.    The Commonwealth of Massachusetts and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Massachusetts, including claims related to outpatient diagnostic services.

423.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Massachusetts state-funded plan beneficiaries.

424.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under

the Medicaid program and/or other state-funded programs, in violation of MASS. GEN. LAWS ch. 12, § 5B(a)(1).

425.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of MASS. GEN. LAWS ch. 12, § 5B(a)(2).

426.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of MASS. GEN. LAWS ch. 12, § 5B(a)(9).

427.    The Commonwealth of Massachusetts, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

428.    As a result of Defendants' actions, as set forth above, the Commonwealth of Massachusetts and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXII**
**Violation of Minnesota False Claims Act**

**State of Minnesota vs. CareCore and the Defendant Insurers**

429.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

430.    This is a civil action brought by Relator in the name of the State of Indiana against Defendants, CareCore and the Defendant Insurers, under the Minnesota False Claims Act, MINN. STAT. § 15C.05.

431.    The State of Minnesota and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Minnesota, including claims related to outpatient diagnostic services.

432.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Minnesota state-funded plan beneficiaries.

433.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under

- 116 -

the Medicaid program and/or other state-funded programs, in violation of MINN. STAT. § 15C.02(a)(1).

434.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of MINN. STAT. § 15C.02(a)(2).

435.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of MINN. STAT. § 15C.02(a)(7).

436.    The State of Minnesota, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

437.    As a result of Defendants' actions, as set forth above, the State of Minnesota and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIII
**Violation of Montana False Claims Act**

**State of Montana vs. CareCore and the Defendant Insurers**

438.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

439.    This is a civil action brought by Relator in the name of the State of Montana against Defendants, CareCore and the Defendant Insurers, under the Montana False Claims Act, MONT. CODE ANN. § 17-8-406.

440.    The State of Montana and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Montana, including claims related to outpatient diagnostic services.

441.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Montana state-funded plan beneficiaries.

442.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under

the Medicaid program and/or other state-funded programs, in violation of MONT. CODE ANN. § 17-8-403(1)(a).

443.	Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of MONT. CODE ANN. § 17-8-403(1)(b).

444.	Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of MONT. CODE ANN. § 17-8-403(1)(g).

445.	The State of Montana, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

446.    As a result of Defendants' actions, as set forth above, the State of Montana and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXIV
### Violation of Nevada False Claims Act

### State of Nevada vs. CareCore and the Defendant Insurers

447.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

448.    This is a civil action brought by Relator in the name of the State of Nevada against Defendants, CareCore and the Defendant Insurers, under the Nevada False Claims Act, NEV. REV. STAT. § 357.080.

449.    The State of Nevada and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Nevada, including claims related to outpatient diagnostic services.

450.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Nevada state-funded plan beneficiaries.

451.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of NEV. REV. STAT. § 357.040(1)(a).

- 120 -

452.     Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of NEV. REV. STAT. § 357.040(1)(b).

453.     Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of NEV. REV. STAT. § 357.040(1)(g).

454.     The State of Nevada, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

455.     As a result of Defendants' actions, as set forth above, the State of Nevada and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXV**
**Violation of New Mexico Medicaid False Claims Act**

**State of New Mexico vs. CareCore and the Defendant Insurers**

456. Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein. The allegations contained in this Count are based upon information and belief.

457. This is a civil action brought by Relator in the name of the State of New Mexico against Defendants, CareCore and the Defendant Insurers, under the New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-7(B).

458. The State of New Mexico and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in New Mexico, including claims related to outpatient diagnostic services.

459. Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for New Mexico state-funded plan beneficiaries.

460. Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of N.M. STAT. ANN. § 27-14-4(A).

461. Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge

- 122 -

of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of N.M. STAT. ANN. § 27-14-4(B).

462.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of N.M. STAT. ANN.  § 27-14-4(E).

463.   The State of New Mexico, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

464.   As a result of Defendants' actions, as set forth above, the State of New Mexico and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVI
### Violation of North Carolina False Claims Act

### State of North Carolina vs. CareCore and the Defendant Insurers

465. Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein. The allegations contained in this Count are based upon information and belief.

466. This is a civil action brought by Relator in the name of the State of North Carolina against Defendants, CareCore and the Defendant Insurers, under the North Carolina False Claims Act, N.C. GEN. STAT. § 1-608(b).

467. The State of North Carolina and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in North Carolina, including claims related to outpatient diagnostic services.

468. Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for North Carolina state-funded plan beneficiaries.

469. Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of N.C. GEN. STAT. § 1-607(a)(1).

470. Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge

of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of N.C. GEN. STAT. § 1-607(a)(2).

471.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of N.C. GEN. STAT. § 1-607(a)(7).

472.    The State of North Carolina, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

473.    As a result of Defendants' actions, as set forth above, the State of North Carolina and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVII
### Violation of Oklahoma Medicaid False Claims Act

### State of Oklahoma vs. CareCore and the Defendant Insurers

474.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

475.    This is a civil action brought by Relator in the name of the State of Oklahoma against Defendants, CareCore and the Defendant Insurers, under the Oklahoma Medicaid False Claims Act, OKLA. STAT. ANN. tit. 63, § 5053.2.B.1.

476.    The State of Oklahoma and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Oklahoma, including claims related to outpatient diagnostic services.

477.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Oklahoma state-funded plan beneficiaries.

478.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of OKLA. STAT. ANN. tit. 63, § 5053.1.B.1.

479.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge

of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of OKLA. STAT. ANN. tit. 63, § 5053.1.B.2.

480.  Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of OKLA. STAT. ANN. tit. 63, § 5053.1.B.7.

481.  The State of Oklahoma, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

482.  As a result of Defendants' actions, as set forth above, the State of Oklahoma and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVIII**
**Violation of Rhode Island False Claims Act**

**State of Rhode Island vs. CareCore and the Defendant Insurers**

483.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

484.    This is a civil action brought by Relator in the name of the State of Rhode Island against Defendants, CareCore and the Defendant Insurers, under the Rhode Island False Claims Act,  R.I. GEN. LAWS § 9-1.1-4(b).

485.    The State of Rhode Island and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Rhode Island, including claims related to outpatient diagnostic services.

486.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Rhode Island state-funded plan beneficiaries.

487.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of R.I. GEN. LAWS § 9-1.1-3(a)(1).

488.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge

- 128 -

of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of R.I. GEN. LAWS § 9-1.1-3(a)(2).

489.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of R.I. GEN. LAWS § 9-1.1-3(a)(7).

490.   The State of Rhode Island, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

491.   As a result of Defendants' actions, as set forth above, the State of Rhode Island and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIX**
**Violation of Texas Medicaid Fraud Prevention Act**

**State of Texas vs. CareCore and the Defendant Insurers**

492.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

493.    This is a civil action brought by Relator in the name of the State of Texas against Defendants, CareCore and the Defendant Insurers, under the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.101.

494.    The State of Texas and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Texas, including claims related to outpatient diagnostic services.

495.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Texas state-funded plan beneficiaries.

496.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of TEX. HUM. RES. CODE ANN. § 36.002(1).

497.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge

of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of TEX. HUM. RES. CODE ANN. § 36.002(2).

498.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of TEX. HUM. RES. CODE ANN. § 36.002(12).

499.    The State of Texas, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

500.    As a result of Defendants' actions, as set forth above, the State of Texas and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXX**
**Violation of Virginia Fraud Against Taxpayers Act**

**Commonwealth of Virginia vs. CareCore and the Defendant Insurers**

501.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

502.    This is a civil action brought by Relator in the name of the Commonwealth of Virginia against Defendants, CareCore and the Defendant Insurers, under the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.5.

503.    The Commonwealth of Virginia and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other commonwealth-funded plans in Virginia, including claims related to outpatient diagnostic services.

504.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Virginia commonwealth-funded plan beneficiaries.

505.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of VA. CODE ANN. § 8.01-216.3(A)(1).

506.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge

of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of VA. CODE ANN. § 8.01-216.3(A)(2).

507. Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of VA. CODE ANN. § 8.01-216.3(A)(7).

508. The Commonwealth of Virginia, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

509. As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXXI**

**Violation of Washington Medicaid Fraud False Claims Act**

**State of Washington vs. CareCore and the Defendant Insurers**

510.   Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

511.   This is a civil action brought by Relator in the name of the State of Washington against Defendants, CareCore and the Defendant Insurers, under the Washington Medicaid Fraud False Claims Act, WASH. REV. CODE § 74.66.050.

512.   The State of Washington and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Washington, including claims related to outpatient diagnostic services.

513.   Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Washington state-funded plan beneficiaries.

514.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of WASH. REV. CODE § 74.66.020(1)(a).

515.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge

of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of WASH. REV. CODE § 74.66.020(1)(b).

516.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of WASH. REV. CODE § 74.66.020(1)(g).

517.   The State of Washington, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

518.   As a result of Defendants' actions, as set forth above, the State of Washington and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXXII**
**Violation of Wisconsin Medicaid False Claims Act**

**State of Wisconsin vs. CareCore and the Defendant Insurers**

519.    Relator incorporates herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

520.    This is a civil action brought by Relator in the name of the State of Wisconsin against Defendants, CareCore and the Defendant Insurers, under the Wisconsin Medicaid False Claims Act, WIS. STAT. § 20.931(5).

521.    The State of Wisconsin and/or one of its agents contracted, directly or indirectly, with one or more Defendant Insurers in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Wisconsin, including claims related to outpatient diagnostic services.

522.    Defendants Insurers, directly or indirectly, contracted with CareCore in connection with the administration of requests for pre-authorization of diagnostic services for Wisconsin state-funded plan beneficiaries.

523.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of WIS. STAT. § 20.931(2)(a).

524.    Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge

- 136 -

of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of WIS. STAT. § 20.931(2)(b).

525.   Defendants, CareCore and the Defendant Insurers, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of WIS. STAT. § 20.931(2)(g).

526.   The State of Wisconsin, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, CareCore and the Defendant Insurers, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for diagnostic services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

527.   As a result of Defendants' actions, as set forth above, the State of Wisconsin and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Relator prays that judgment be entered against Defendants, ordering as follows:

A.      That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*; CAL. GOV'T CODE § 12650, *et seq.*;   COLO. REV. STAT. ANN. § 25.5-4-303.5, *et seq.*;   CONN. GEN. STAT. § 17b-301, *et seq.*; DEL. CODE ANN. tit. 6, § 1201, *et seq.*; D.C. CODE ANN. § 2-381.01, *et seq.*; FLA. STAT. ANN. § 68.081, *et seq.*;   GA. CODE ANN. § 49-4-168, *et seq.*;   HAW. REV. STAT. § 661-21, *et seq.*;   740 ILL. COMP. STAT. ANN. 175/1, *et seq.*;   IND. CODE § 5-11-5.5-1, *et seq.*; IOWA CODE § 685.1, *et seq.*;   LA. REV. STAT. ANN. § 46:437.1, *et seq.*;   MD. CODE ANN., Health-Gen. § 2-601, *et seq.*;   MASS. GEN. LAWS ch. 12, § 5A, *et seq.*;   MICH. COMP. LAWS ANN. § 400.601, *et seq.*;   MINN. STAT. § 15C.01, *et seq.*;   MONT. CODE ANN. § 17-8-401, *et seq.*; NEV. REV. STAT. § 357.010, *et seq.*; N.J. STAT. ANN. § 2A:32C-1, *et seq.*; N.M. STAT. ANN. § 27-14-1, *et seq.*; N.Y. STATE FIN. LAW § 187, *et seq.*; N.C. GEN. STAT. § 1-605, *et seq.*; OKLA. STAT. ANN. tit. 63, § 5053, *et seq.*;   R.I. GEN. LAWS § 9-1.1-1, *et seq.*;   TENN. CODE ANN. § 71-5-181, *et seq.*; TEX. HUM. RES. CODE ANN. § 36.001, *et seq.*;   VA. CODE ANN. § 8.01-216.1, *et seq.*;   WASH. REV. CODE § 74.66.005, *et seq.*; and WIS. STAT. § 20.931;

B.      That civil penalties of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) be imposed for each and every false or fraudulent claim that Defendants caused to be submitted to the United States and/or its grantees, as per 31 U.S.C. § 3729(a)(1) and for each false record or statement Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim, that three times the amount of damages the United States sustained because of Defendants' actions also be imposed;

- 138 -

C.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of California or its agencies or political subdivisions, multiplied times three, as provided for in CAL. GOV'T CODE § 12651(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the California False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of California for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

D.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Colorado or its agencies or political subdivisions, multiplied times three, as provided for in COLO. REV. STAT. ANN. § 25.5-4-305(1), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Colorado Medicaid False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of Colorado for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

E.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Connecticut or its agencies or political subdivisions, multiplied times three, as provided for in CONN. GEN. STAT. § 17b-301b(b)(1), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Connecticut False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the

various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Delaware or its agencies or political subdivisions, multiplied times three, as provided for in DEL. CODE ANN. tit. 6, § 1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Delaware False Claims and Reporting Act, to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

G.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the District of Columbia or its agencies or political subdivisions, multiplied times three, as provided for in D.C. CODE ANN. § 2-381.02(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the District of Columbia Medicaid Fraud Enforcement and Recovery Amendment Act of 2012, to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies or political subdivisions, multiplied as provided for in FLA. STAT. ANN. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000), as

- 140 -

provided by FLA. STAT. ANN. § 68.082, to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Georgia or its agencies or political subdivisions, multiplied as provided for in GA. CODE ANN. § 49-4-168.1, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false or fraudulent claim, as provided by GA. CODE ANN. § 49-4-168.1, to the extent such multiplied penalties shall fairly compensate the State of Georgia or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Hawaii or its agencies or political subdivisions, multiplied times three, as provided for in HAW. REV. STAT. § 661-21(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Hawaii False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Illinois or its agencies or political subdivisions, multiplied as provided for in 740 ILL. COMP. STAT. ANN. 175/3, plus a civil penalty of not less

than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000), as provided for in 740 ILL. COMP. STAT. ANN. 175/3, to the extent such multiplied penalties shall fairly compensate the State of Illinois or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

       L.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Indiana or its agencies or political subdivisions, multiplied times three, as provided for in IND. CODE § 5-11-5.5-2(b), plus a civil penalty of not less than five thousand dollars ($5,000), pursuant to the Indiana False Claims and Whistleblower Protection Act, to the extent such multiplied penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

       M.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Iowa or its agencies or political subdivisions, multiplied times three, as provided for in IOWA CODE § 685.1, plus a civil penalty of not less than and not more than the amounts of the civil penalties allowed under the Federal False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of Iowa for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

       N.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Louisiana or its agencies or political subdivisions, plus a fine of not to exceed ten thousand dollars ($10,000) or three times the value of the illegal remuneration, whichever is greater, as provided for in LA. REV. STAT. ANN. § 46:438.6, plus a

civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Louisiana Medical Assistance Programs Integrity Law, to the extent such multiplied penalties shall fairly compensate the State of Louisiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

O.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Maryland or its agencies or political subdivisions, multiplied as provided for in MD. CODE ANN., Health-Gen. § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000) for each false claim, pursuant to MD. CODE ANN., Health-Gen. § 2-602(b)(1)(i), to the extent such multiplied penalties shall fairly compensate the State of Maryland or its agencies or political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Massachusetts or its agencies or political subdivisions, multiplied times three, as provided for in MASS. GEN. LAWS ch. 12, § 5B, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Massachusetts False Claims Act, to the extent such multiplied penalties shall fairly compensate the Commonwealth of Massachusetts for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Q.      That judgment be entered in Relator's favor and against Defendants in the amount of damages sustained by the State of Michigan or its agencies or political subdivisions, for the

value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MICH. COMP. LAWS ANN. §§ 400.603 – 400.606, 400.610b, in order to fairly compensate the State of Michigan or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

R.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Minnesota or its agencies or political subdivisions, multiplied times three, as provided for in MINN. STAT. § 15C.02, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Minnesota False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of Minnesota for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

S.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Montana or its agencies or political subdivisions, multiplied times three, as provided for in MONT. CODE ANN. § 17-8-403, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Montana False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of Montana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

T.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Nevada or its agencies or political subdivisions,

multiplied times three, as provided for in NEV. REV. STAT. § 357.040, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the Nevada False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its agencies or political subdivisions, multiplied as provided for in N.J. STAT. ANN. § 2A:32C-3, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation, as provided by N.J. STAT. ANN. § 2A:32C-3, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of New Mexico or its agencies or political subdivisions, multiplied times three, as provided for in N.M. STAT. ANN. §§ 27-14-2, 27-14-4, to the extent such multiplied penalties shall fairly compensate the State of New Mexico for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

W.     That judgment be entered in Relator's favor and against Defendants in the amount of damages sustained by the State of New York or its agencies or political subdivisions, multiplied as provided for in N.Y. STATE FIN. LAW § 189(1)(h), plus a civil penalty of not less

than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. STATE FIN. LAW § 189(1)(h), to the extent such multiplied penalties shall fairly compensate the State of New York or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

> X.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of North Carolina or its agencies or political subdivisions, multiplied times three, as provided for in N.C. GEN. STAT. § 1-607, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the North Carolina False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

> Y.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its agencies or political subdivisions, multiplied times three, as provided for in OKLA. STAT. ANN. tit. 63, § 5053.1, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the Oklahoma Medicaid False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of Oklahoma for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

> Z.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its agencies or political subdivisions,

multiplied times three, as provided for in R.I. GEN. LAWS § 9-1.1-3, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the Rhode Island False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of Rhode Island for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

AA.    That judgment be entered in Relator's favor and against Defendants in the amount of damages sustained by the State of Tennessee or its agencies or political subdivisions, multiplied as provided for in TENN. CODE ANN. § 71-5-182(a)(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) pursuant to TENN. CODE ANN. § 71-5-182(a)(l), to the extent such multiplied penalties shall fairly compensate the State of Tennessee or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

BB.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Texas or its agencies or political subdivisions, multiplied times two, as provided for in TEX. HUM. RES. CODE ANN. § 36.052, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) (or not more than fifteen thousand dollars ($15,000) if resulting in injury to an elderly person, a disabled person or a child under the age of eighteen) for each act in violation of the Texas Medicaid Fraud Prevention Act, to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by

Defendants, together with penalties for specific claims to be identified at trial after full discovery;

CC.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia or its agencies or political subdivisions, multiplied times three, as provided for in VA. CODE ANN. § 8.01-216.3, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Virginia Fraud Against Taxpayers Act, to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

DD.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Washington or its agencies or political subdivisions, multiplied times three, as provided for in WASH. REV. CODE § 74.66.020, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Washington Medicaid Fraud False Claims Act, to the extent such multiplied penalties shall fairly compensate the State of Washington for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery; and

EE.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Wisconsin or its agencies or political subdivisions, multiplied times three, as provided for in WIS. STAT. § 20.931(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the Wisconsin Medicaid False Claims Act, to the extent such multiplied penalties

- 148 -

shall fairly compensate the State of Wisconsin for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

FF.    That Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

GG.    That Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

HH.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and § 3730(h), CAL. GOV'T CODE § 12650, *et seq*., COLO. REV. STAT. ANN. § 25.5-4-303.5, *et seq*., CONN. GEN. STAT. § 17b-301, *et seq*., DEL. CODE ANN. tit. 6, § 1201, *et seq*., D.C. CODE ANN. § 2-381.01, *et seq*., FLA. STAT. ANN. § 68.081, *et seq*., GA. CODE ANN. § 49-4-168, *et seq*., HAW. REV. STAT. § 661-21, *et seq*., 740 ILL. COMP. STAT. ANN. 175/1, *et seq*., IND. CODE § 5-11-5.5-1, *et seq*.;  IOWA CODE § 685.1, *et seq*.;  LA. REV. STAT. ANN. § 46:437.1, *et seq*., MD. CODE ANN., Health-Gen. § 2-601, *et seq*., MASS. GEN. LAWS ch. 12, § 5A, *et seq*., MICH. COMP. LAWS ANN. § 400.601, *et seq*., MINN. STAT. § 15C.01, *et seq*.; MONT. CODE ANN. § 17-8-401, *et seq*.; NEV. REV. STAT. § 357.010, *et seq*.; N.J. STAT. ANN. § 2A:32C-1, *et seq*., N.M. STAT. ANN. § 27-14-1, *et seq*., N.Y. STATE FIN. LAW § 187, *et seq*., N.C. GEN. STAT. § 1-605, *et seq*.; OKLA. STAT. ANN. tit. 63, § 5053, *et seq.;* R.I. GEN. LAWS § 9-1.1-1, *et seq*., TENN. CODE ANN. § 71-5-181, *et seq*., TEX. HUM. RES. CODE ANN. § 36.001, *et seq*.;  VA. CODE ANN. § 8.01-216.1, *et seq*.; WASH. REV. CODE § 74.66.005, *et seq*.; and WIS. STAT. § 20.931;

II.      That Relator be awarded all costs, including but not limited to, court costs, expert fees and all attorneys' fees, costs and expenses incurred by Relator in the prosecution of this suit; and

JJ.      That Relator be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator demands a trial by jury of all issues so triable.

DATED:     November 18, 2014                    Respectfully submitted,

**SEEGER WEISS LLP**

By: _____

Stephen A. Weiss, Esq.
TerriAnne Benedetto, Esq.
77 Water Street
New York, NY 10005
Tel:   (212) 584-0700
sweiss@seegerweiss.com
tbenedetto@seegerweiss.com

**MILBERG LLP**

Matthew Gluck, Esq.
Kirk E. Chapman, Esq.
Anna C. Dover, Esq.
Rolando G. Marquez, Esq.
One Pennsylvania Plaza
New York, New York  10119-0165
Tel:   212.594.5300
Fax:   212.868.1229
mgluck@milberg.com
kchapman@milberg.com
adover@milberg.com
rmarquez@milberg.com

*Counsel for Plaintiff/Relator John Miller*